UNITED STATES, Appellee,

v.

Arthur L. MIDDLETON, Specialist Four,
U. S. Army, Appellant.

No. 33,511.
CMR 11890/S.

U. S. Court of Military Appeals.

Jan. 5, 1981.

For appellant: *Captain John H. Milne* (argued), *Captain Charles E. Trant* (rear-gued); *Colonel Robert B. Clarke, Lieuten-*

ant Colonel John R. Thornock, Major D. David Hostler (on brief); Colonel Edward S. Adamkewicz, Jr., Major Elliot J. Clark, Jr., Captain Jan W. Serene.

For appellee: Captain Laurence M. Huffman (argued), Colonel R. R. Boller (reargued); Colonel Thomas H. Davis (on brief); Major Steven M. Werner, Captain Gary F. Thorne, Captain William J. Douglas.

## Opinion of the Court

EVERETT, Chief Judge.

A special court–martial convicted the appellant, contrary to his pleas, of having wrongfully possessed lysergic acid diethylamide (LSD) and marihuana, contrary to Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934, respectively. Ultimately,[1] this Court granted the appellant's petition to review his allegation that he was substantially and materially prejudiced by the admission against him at trial of evidence [2] seized from his wall locker during an illegal search of that locker.[3] The Government submits that the activity of which the appellant complains was not a search incident to a criminal investigation, but a lawful health and welfare inspection of the appellant's unit to insure its fitness. Alternatively, the Government contends that if there was a search for evidence of crime, it was conducted with the consent of the appellant.

We conclude that while the appellant's company commander initially had embarked on no more than a permissible inspection of his unit, the inspection took on a different character at the point of entry into the appellant's locker. However, we need not decide whether the appellant's "consent" to the intrusion was no more than acquiescence to the color of authority and, thus, not voluntary, for there existed adequate probable cause for the ensuing search, which in our view the company commander implicitly authorized. Accordingly, we hold that the appellant's conviction was not obtained as a result of improper use of evidence tainted by an illegal search of his locker.

I

Sometime in early July, 1975, the appellant's company commander, Captain Cole, decided to conduct a health and welfare inspection of his unit on July 31, 1975, in accord with the battalion policy that such inspections be conducted quarterly. The inspection was "designed to check the living area of the troops to insure the areas are sanitary, there's no safety hazards [sic], the living conditions are proper and that there's no conditions [sic] that would be harmful to the individual." As a part of that inspection, Cole decided to utilize a drug detection dog. To coordinate this use with the dog handlers, Cole visited their unit about two or three weeks before the inspection. At that time, the training and use of such a dog was explained to Cole, and he was advised that a demonstration of the dog's reliability would be conducted in his office on the morning of the inspection.

1. The convening authority approved and the United States Army Court of Military Review affirmed the findings and the sentence of a bad–conduct discharge, confinement at hard labor for 5 months, and reduction to the lowest enlisted grade. After the appellant petitioned this Court for review, we remanded the case to the Court of Military Review for consideration of issues which the appellant had raised here for the first time. That court, in turn, again affirmed the trial results, and the appellant again petitioned for review.

2. It is only the conviction of the marihuana offense, supported by the marihuana found in the appellant's locker, which is challenged in this appeal.

3. In ruling upon a similar claim at trial, the military judge held that the examination "was a health and welfare inspection and not an illegal search." He then proceeded to state that while he had some doubts as to the existence of probable cause, he need not resolve whether probable cause was necessary because he was satisfied beyond a reasonable doubt that the appellant had voluntarily consented to the search. Thus, it is somewhat unclear exactly what was the basis of the trial judge's ruling admitting the evidence–inspection or consent search–but they appear to be in the alternative.

On July 31, the appellant's unit fell out for their normal physical training at 6:30 a. m. At 6:45 Brandy and her handler arrived at Cole's office. Cole was given a bag of marihuana to hide, which he did, and Brandy capably found it. Convinced of her reliability, Cole set out with Brandy, her handler, a Military Police Investigations (MPI) agent, and apparently either the first sergeant or some other noncommissioned officer. It appears that Cole separated himself from the dog team; while he inspected all the rooms—offices and all—on the first and second floors "for conditions like broken windows, laundry problems, food crumbs, serviceability of clothing and wall lockers and what not," the others entered each room and Brandy was allowed to conduct her "search pattern" in each one. When the team entered the appellant's room, Brandy "alerted" on the appellant's wall locker; and Captain Cole was informed of this occurrence. Upon arriving at the room, Cole had the dog brought out into the hall and they entered the room anew; Brandy was permitted to conduct her pattern and, once again, she alerted in a specified manner on the appellant's locker.

The appellant was sent for and when he arrived, MPI Agent Crider explained to the appellant that Brandy was a dog trained to detect the presence of marihuana and dangerous drugs and that she had alerted on his locker. It appears, further, that at this point, Brandy conducted a search pattern still again and did so with the same results. Crider advised the appellant that he was under apprehension and further advised him of his rights under Article 31, UCMJ, 10 U.S.C. § 831, that the dog's alert gave them probable cause to search the locker, and that they would like to have his consent to search the locker but that he did not need to give it if he did not wish to do so. Thereupon, the appellant indicated they could look through his locker; and he unlocked and opened it. A thorough examination of the locker and its contents by Crider

revealed the evidence which became the subject of the marihuana charge against the appellant. Crider put the evidence into an evidence container and initialed and dated it.

Several other facts involved in this inspection are material to our consideration. First, Cole had not told his unit to unlock their wall lockers; while several were left unlocked (which Cole candidly admitted looking into during his inspection), most were left locked and were not disturbed in that condition unless Brandy alerted thereon. Second, when Cole was asked at trial how he could inspect clothing if the lockers were left locked, he explained that it was routine for his men to hang broom sticks between their lockers and to hang their clothing on those sticks. Third, the appellant's room was either a two—man or a three—man room, separated by partitions to give each occupant his individual space. Fourth, Cole testified that he would assume from various conversations to which he was privy in his unit that its members knew that he could authorize a search of their lockers, even without their consent, if he had probable cause for doing so. Finally, while he did not expressly authorize the search, thinking the appellant's consent made this unnecessary, he had already decided in his own mind to approve the search on the basis of the probable cause furnished by Brandy's alert; and he would have articulated this authorization had the appellant withheld his apparent consent.

## II

■ It has often been said that the Bill of Rights[4] applies with full force to men and women in the military service unless any given protection is, expressly or by necessary implication, inapplicable. *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979); *United States v. Jacoby*, 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960). While certain protections have been deemed inapplicable,[5] nei-

4. U.S.Const. amends. I–X.

5. The Fifth Amendment expressly excepts cases "arising in the land or naval forces, or in

the Militia, when in actual service in time of War or public danger," from the guarantee of presentment or indictment by a grand jury. Also, the Supreme Court has held that the

ther this Court nor the Supreme Court has ever held that the Fourth Amendment does not shield the American serviceperson. "Indeed, the opposite is true." *United States v. Ezell, supra* at 313.

This is not to say, however, that in its application the Fourth Amendment does not take into account the exigencies of military necessity and unique conditions that may exist within the military society. Military exigencies may be present under the particular facts of a given case, *see, e. g., United States v. Hessler*, 7 M.J. 9 (C.M.A. 1979); or they may exist with respect to a whole category of intrusions, *see United States v. Harris*, 5 M.J. 44 (C.M.A.1978); *United States v. Unrue*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973); *United States v. Poundstone*, 22 U.S.C.M.A. 277, 46 C.M.R. 277 (1973). Of course, when it is suggested that a different rule should apply to military searches and seizures than to those in the civilian community, some burden exists to show the need for such a variation.[6]

The Fourth Amendment's basic safeguard is against "unreasonable searches and seizures." In recent decisions, the Supreme Court has closely linked this protection to the reasonable expectations of privacy of the person asserting the Fourth Amendment claim. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633 (1980); *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979); *Katz v. United States*, 389 U.S. 347, 83 S.Ct. 507, 19 L.Ed.2d 576 (1967). Since "the military is, by necessity, a specialized society separate from civilian society," *see Parker v. Levy*,

417 U.S. 733, 743, 94 S.Ct. 2547, 2547, 41 L.Ed.2d 439 (1974), quoted in *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980), it is foreseeable that reasonable expectations of privacy within the military society will differ from those in the civilian society.

In considering what expectations of privacy a service member may reasonably entertain concerning military inspections, we must recognize that such inspections are time–honored and go back to the earliest days of the organized militia. They have been experienced by generations of Americans serving in the armed forces. Thus, the image is familiar of a soldier standing rigidly at attention at the foot of his bunk while his commander sternly inspects him, his uniform, his locker, and all his personal and professional belongings.

Such inspections were undoubtedly contemplated by the reference in the 1969 Manual for Courts–Martial to "administrative inspections or inventories conducted in accordance with law, regulation, or *custom*." Para. 152, Manual for Courts–Martial, United States, 1969 (Revised edition) (emphasis supplied). The 1951 Manual also mentioned searches "made in accordance with military *custom*." Para. 152, Manual for Courts–Martial, United States, 1951 (emphasis supplied).

This Court has dealt on many occasions with various types of military inspections. Indeed, we have long acknowledged that the inspection has traditionally been a "tool" for a commander to use in insuring "the overall fitness of [his] unit to perform its military mission." [7] *United States v.*

---

Sixth Amendment's guarantee of counsel does not apply to a serviceperson in a summary court–martial, since it is not a "criminal prosecution." *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976).

**6.** "When a party urges that a different rule obtains in the military than in the civilian sector, the burden is upon that party to show the need for such a variation. *Courtney v. Williams*, 1 M.J. 267 (C.M.A.1976)." *United States v. Ezell*, 6 M.J. 307, 313 (C.M.A.1979).

**7.** The Army Court of Military Review well discussed the indicia of a traditional military inspection, as compared to a generalized search:

A military inspection is an examination or review of the person, property, and equipment of a soldier, the barracks in which he lives, the place where he works, and the material for which he is responsible. An inspection may relate to readiness, security, living conditions, personal appearance, or a combination of these and other categories. Its purpose may be to examine the clothing and appearance of individuals, the presence

*Wenzel,* 7 M.J. 95, 97 (C.M.A.1979) (Fletcher, C. J., concurring). *See United States v. Grace,* 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970); *United States v. Lange,* 15 U.S.C. M.A. 486, 35 C.M.R. 458 (1965). It is part of a "disciplinary cost" to be paid by a citizen soldier in order to "shoulder his 'readiness' burden," *United States v. Wenzel, supra* at 97; and it is one of those intrusions which are "eminently reasonable as concomitant to the constitutional responsibility of the military service to be ready to defend the primary society." *United States v. Hessler, supra* at 10. What the Supreme Court of the United States said in *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975), rings particularly true in this context:

> To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powerful now as in the past.

Thus, as was observed in *United States v. Roberts,* 2 M.J. 31, 36 (C.M.A.1976), "the traditional military inspection which looks at the overall fitness of a unit to perform its military mission is a permissible deviation from what may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion *which a*

serviceperson must expect in a military society." (Emphasis supplied). While the living conditions of the modern serviceperson may be more comfortable—and, indeed, more private [8]—than those known by their fathers, still the basic purpose for existence of the military has not altered; and neither has the need for the tool of inspection to insure the readiness of the individual serviceperson and of his unit to respond to an emergency.

■ Upon this analysis, then, we may safely conclude that during a traditional military inspection, no serviceperson whose area is subject to the inspection may reasonably expect any privacy which will be protected from the inspection.[9] The service member would not normally expect it; and if he did, the parent society would not be willing to honor that expectation.[10] *Cf. Smith v. Maryland, supra.*

■ If the criticism be voiced that, in effect, we have narrowed the rights of military personnel, the reply is that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty," *Parker v. Levy, supra* 417 U.S. at 744, 94 S.Ct. at 2547, quoting from *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953). The Supreme Court has remarked that "it is the primary business of armies and navies to fight or be ready to

---

and condition of equipment, the state of repair and cleanliness of barracks and work areas, and the security of an area or unit. Except for the ceremonial aspect, its basis is military necessity.

Among the attributes of an inspection are: that it is regularly performed; often announced in advance; usually conducted during normal duty hours; personnel of the unit are treated evenhandedly; and there is no underlying law enforcement purpose. An inspection is distinguished from a generalized search of a unit or geographic area based upon probable cause in that the latter usually arises from some known or suspected criminal conduct and usually has a law enforcement as well as a possible legitimate inspection purpose.

*United States v. Hay,* 3 M.J. 654, 655–56 (A.C. M.R.1977).

8. The armed services have made increasing efforts to provide privacy for service members in

their dormitories and barracks. However, providing greater privacy for service members in relation to each other is not inconsistent with the commander's reserved power to make military inspections.

9. This is not to say that the inspection may not change its character during the process so that thereafter its legitimacy will not be sustained on the basis of the lack of a reasonable expectation of privacy. *See United States v. Grace,* 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970).

10. As the linchpin of this analysis is that the traditional military inspection, under normal circumstances, is a reasonable intrusion which a serviceperson expects and which society tolerates, care must be taken in any case that the circumstances of the inspection not be unreasonable; otherwise, the analysis is inapplicable and the intrusion loses its justification.

fight wars should the occasion arise." 417 U.S. at 743, 94 S.Ct. at 2547, quoting from *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). *Accord, Schlesinger v. Councilman, supra* at 757, 95 S.Ct. at 1312. Our Court's recognition of this "primary business" was recently reaffirmed in *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980), which concerned the service connection of off–post drug offenses. Accordingly, during a legitimate health and welfare inspection, the area of the inspection becomes "public" as to the commander, for no privacy from the commander may be expected within the range of the inspection. Furthermore, if the commander sees what he can readily identify as a prohibited item–whether it be alcohol, a weapon, or controlled drugs–he may seize it. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ However, the commander is not limited to the use of his eyes as tools for the inspection. If, for instance, he hears the whimpers of an animal inside a locker, he need not ignore what his auditory sense has told him. Similarly, if the commander's olfactory sense is sufficiently developed to permit him to detect a prohibited item in a locker–whether it be the odor of rotting food or that of a contraband drug–certainly he is entitled under these circumstances to take appropriate steps to remove the prohibited substance. If the location from which he detected the presence of such items is within the established zone of the inspection, he may intrude therein promptly to remedy the situation, for under such circumstances, the individual lacks a reasonable expectation of privacy from the commander during the inspection. And if such location is outside the scope of the inspection, the commander's hands still are not

tied, for it is well established in the law that such natural perceptions, if well founded, may serve as the basis for a determination of probable cause sufficient to search the suspected area. *See Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Hessler, supra.*

■ This rationale extends, as well, to the use by the commander of a trained drug–detection dog as a means of enhancing his own natural senses. The Supreme Court implied as much in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and this Court squarely so held in *United States v. Grosskreutz*, 5 M.J. 344 (1978). *Accord, United States v. Solis*, 536 F.2d 880 (9th Cir. 1976). When the dog is in the company of the commander or a member of the commander's inspection party in an area which, by virtue of the inspection, has become "public" to the inspecting party, the dog's detection ·of odors emanating even from an area not included within that particular inspection–and, hence, private–is permissible and may serve to support probable cause sufficient to allow a physical intrusion into that area in search of the detected item. *See United States v. Grosskreutz, supra.*

We are not deterred from this conclusion by the fact that the sole function of the dog is to detect the presence of substances whose possession is criminally proscribed.[11] If the area in which the commander roams is public as to him, and if a commander may lawfully use a drug–detection dog to enhance his own natural senses, then the conclusion follows that a drug–detection dog is a proper incident of a legitimate fitness and readiness inspection.[12]

---

11. While involvement with dangerous drugs certainly is criminally punishable, it also constitutes a real threat to the functioning of any military unit and, hence, to the operation of the military services in their constitutional role of this country's defense. *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980). The "high degree of interdependence" between members of the military society, not present in civilian society (*see United States v. Hessler*, 4 M.J. 303, 308

(C.M.A.1978) (Fletcher, C.J., concurring in the result)), causes the serious problem of drug abuse to have a significant national impact not present to the same degree in the civilian sector. *See United States v. Hessler*, 7 M.J. 9 (C.M.A.1979).

12. We have considered carefully the recently decided case of *Jones v. Latexo Independent School District*, 499 F.Supp. 223 (E.D.Tex.

Concern has been expressed that the "commander's authority to inspect to carry out his *military* mission inevitably would lead under existing admissibility standards to use of such inspections solely to conduct law enforcement operations or as a ruse for others within the military justice system to avoid the probable cause requirements of the Fourth Amendment." This concern prompted Chief Judge Fletcher to reason that "the exclusionary rule safeguard must be implemented to discourage such a course of action." He concluded:

> Therefore, while I sanction the commander's constitutional right to conduct such inspections as part of his *command* function, the abuses inherent in any such inspection authority lead me to conclude that, to discourage future unlawful police activity, the fruits of all such inspections may not be used either as evidence in a criminal or quasi–criminal proceeding or as a basis for establishing probable cause under the Fourth Amendment.

*United States v. Thomas*, 1 M.J. 397, 405 (C.M.A.1976) (Fletcher, C.J., concurring in the result) (footnotes omitted).

However, if there is some other safeguard besides an exclusionary rule which will effectively discourage misuse of the traditional military inspection to accomplish unlawful police activity, use of such an al-

1980), to which appellate defense counsel have invited our attention. If we assume the correctness of that decision, *but see Doe v. Renfrow*, 475 F.Supp. 1012 (N.D.Ind. 1979) *(appeal pending)*, the situation presented there is distinguishable. For example, *Jones* involved searches of the high school students by a large attack dog wherein the dog, was "sniffing each child" and may even have "slobbered" on one child. As Chief Judge Justice observed, "the use of an animal such as Merko to conduct a search may offend the sensibilities of those targeted for inspection." 499 F.Supp. at 233 (p. 12 of slip opinion). No search of a person is involved here. Moreover, as we have discussed earlier, a serviceperson simply may not reasonably expect the same degree of privacy during an inspection that a civilian citizen enjoys–even a school child subject to the *in loco parentis* doctrine.

Chief Judge Justice relied on the standard expressed by the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979):

ternative would seem preferable to exclusion of the evidence, since there is increased judicial reluctance to utilize exclusion of relevant evidence as a means of deterring unlawful police activity. *Cf. Rawlings v. Kentucky, supra; United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

In dealing with administrative inspections, the Supreme Court initially allowed them to be conducted without prior judicial authorization. *Frank v. Maryland*, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). Subsequently, it concluded that such inspections–conducted by housing inspectors, building inspectors, fire inspectors, and the like–were "searches" entitled to Fourth Amendment protection and that usually some type of prior authorization from a magistrate would be necessary. *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). However, at the same time the Court ruled that the probable cause required for the customary search warrant would not be necessary and that, instead, the court order for an inspection could be obtained on the basis of standards related to the administrative program being en-

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

In the case at hand, the application of this standard would lead to the conclusion that the use of the drug detection dog was reasonable in light of the scope and manner of the use, the justification therefor, and the place where the dog was being employed.

Chief Judge Justice also ruled that the search of automobiles of the school children violated their Fourth Amendment rights. His rationale in that regard has already been rejected by this Court in *United States v. Grosskreutz*, 5 M.J. 344 (C.M.A.1978).

forced. Thus, the Court reconciled the need to accomplish inspections in order to implement important programs undertaken by cities and states under their "police power" with protection against misuse of administrative inspections for other purposes.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court rejected the contention that a "stop and frisk" is not a "search and seizure" and therefore falls outside the protection of the Fourth Amendment. However, instead of requiring probable cause as a prerequisite for a "stop and frisk," the Court held that a policeman could take such action if he had reasonable suspicion that the person to be "frisked" was armed and if the patdown was suitably related to its lawful purpose of finding a weapon. In so holding, the Court sought to achieve a balance between society's need to protect its policemen from injury and the protection of citizens from indiscriminate invasions of the privacy of their persons. *Cf. Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

In *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the Supreme Court held inadmissible fingerprints which had been obtained from a defendant who had been detained as part of a dragnet in which more than twenty suspects were seized. Nonetheless, the Court intimated that, with proper safeguards, fingerprints could be obtained from a suspect on the basis of something less than the usual probable cause. Once again, the Court was giving a broad construction to the term "search and seizure" in the Fourth Amendment, but was holding that "reasonableness" of a search does not always depend on probable cause.

Military Rule of Evidence 313(b), which took effect on September 1, 1980, also seeks to achieve a reconciliation between the needs of society and the rights of the individual. After defining "inspection," [13] the Rule provides that when the purpose of an inspection includes locating and confiscating contraband,[14] then a dual test must be met before the contraband fruits of that inspection may be used in a criminal proceeding: First, it must be concluded that the "contraband . . . would affect adversely the security, military fitness, or good order and discipline of the command";[15] second, either there must be "a reasonable suspicion that such property is present in the command" or the inspection must have been "a previously scheduled examination of the command."

We need not now decide on the legality of this Rule, nor bless its application. However, we do accept its premise that under some circumstances contraband located in the course of a military inspection may be received in evidence. Such evidence

---

**13.** "An 'inspection' is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty . . . . An examination made for the primary purpose of obtaining evidence for use in a trial by court–martial or in other disciplinary proceedings is not an inspection within the meaning of this rule."

**14.** The Rule applies even if that is only one of many purposes to be served by the inspection. Whether such was among the purposes of any given inspection may be demonstrated not only by an acknowledgment to this effect from the commander, but also by the circumstances of the inspection–e. g., whether a drug–detection dog accompanied the party, whether the commander opened small containers such as cigarette packages likely to contain drugs, or whether pockets of uniforms were looked into.

**15.** Under this Rule the question to be asked apparently is: *If* the contraband substance were present, would it adversely affect the security, military fitness, or good order and discipline of the command?

is admissible when safeguards are present which assure that the "inspection" was really intended to determine and assure the readiness of the unit inspected, rather than merely to provide a subterfuge for avoiding limitations that apply to a search and seizure in a criminal investigation.

### III

■ In the case at bar, we conclude that when Captain Cole initiated his examination of his unit, he embarked upon a traditional health and welfare inspection, which was fully available to him as a tool to insure the fitness and readiness of his personnel and of his unit to fulfill their military mission. The activity was previously scheduled, was in conformity with the battalion policy of regularly conducting such periodic inspections, and was reasonably related to assuring readiness of unit personnel. Moreover, all the circumstances surrounding its conduct were reasonable. Accordingly, during the period of that inspection, all areas subject to it were public as to the commander and his inspection party and the use of Brandy to aid in the inspection was permissible.

■ However, at the point when Brandy alerted on the appellant's locker, the inspection was transformed into a search for evidence to use in a criminal prosecution. *See United States v. Grace, supra.* Captain Cole testified that he had not required the members of his troop to open, or even unlock, their lockers; that most, in fact, were not unlocked; and that while he did look into those which were ajar, those that were not were left undisturbed unless Brandy alerted on them. Under these facts, whatever the situation might have been if the commander had required his personnel to leave their lockers unlocked, examination of appellant's locker was not within the scope of the previously scheduled inspection and was a search incident to a criminal investigation.

### IV

Having concluded that the intrusion into the appellant's locker was not part of the inspection, we proceed to determine upon what basis, if any, it may be sustained.[16] As mentioned earlier, the trial judge in upholding the lawfulness of the search relied on the appellant's consent. Indeed, consent is one of the few established exceptions to both the probable cause and the warrant requirements of the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Price,* 599 F.2d 494 (2nd Cir. 1979). *See Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *Katz v. United States,* 389 U.S. 347, 83 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ For the trial court to find that an accused has consented to an intrusion into his protected privacy, it is incumbent upon the Government to show by "clear and convincing" evidence [17] that such "consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte, supra* 412 U.S. at 222, 93 S.Ct. at 2045, citing *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). Whether consent was given must "be determined from the totality of all the circumstances." 412 U.S. at 227, 93 S.Ct. at 2047. Frequently, it poses issues of fact; but the ultimate question of the existence of consent involves application of a legal standard and so

---

**16.** Wisely, the Government does not urge that the search may be sustained as one incident to lawful arrest. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

**17.** While paragraph 152 of the Manual for Courts–Martial, United States, 1969 (Revised edition), terms the evidentiary burden as "clear and positive evidence," the phrase most commonly found in federal caselaw on the subject is "clear and convincing." *See, e. g., United States v. Bridges,* 499 F.2d 179, 184 n.8 (7th

Cir. 1974), citing *Bumper v. North Carolina, supra,* and *United States v. Como,* 340 F.2d 891 (2d Cir. 1965). *But cf. United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir. 1977), citing *Amos v. United States,* 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed.2d 654 (1921). Inasmuch as we discern no meaningful substantive difference between the two, we prefer to state the standard as "clear and convincing," which is the standard set out in Mil.R.Evid. 314(e)(5).

is subject to appellate review. *See United States v. Faruolo*, 506 F.2d 490, 496 (2nd Cir. 1974) (Newman, Dist. J., concurring). Thus, while always viewing the facts in the light most favorable to the Government, *see United States v. Lowry*, 2 M.J. 55 (C.M.A. 1976), this Court has appropriately concerned itself with whether those facts in any given case support the conclusion of consent. *See, e. g., United States v. Gillis*, 8 M.J. 118 (C.M.A.1979); *United States v. Aros*, 8 M.J. 121 (C.M.A.1979); *United States v. Mayton*, 1 M.J. 171 (C.M.A.1975); *United States v. Vasquez*, 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973). Nonetheless, to give due deference to the trial bench, a conclusion of consent reached below should not be disturbed unless it is unsupported by the evidence of record or was clearly erroneous. *United States v. Williams*, 604 F.2d 1102 (8th Cir. 1979); *United States v. McCaleb, supra; United States v. Tolias*, 548 F.2d 277 (9th Cir. 1977); *United States v. Griffin*, 530 F.2d 739 (7th Cir. 1976). *See United States v. Vasquez, supra.*

Considering the totality of the circumstances, we perceive several factors in the case at hand which fall on either side of the question of consent. Those militating in favor of the trial judge's finding of consent include the reading to appellant of his rights under Article 31 of the Code (*see United States v. Matthews*, 603 F.2d 48 (8th Cir. 1979); *United States v. Lemon*, 550 F.2d 467 (9th Cir. 1977)); the advice to appellant that he need not consent unless he wished to do so (*see United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte, supra*); and the unlocking and opening of the locker by appellant himself, rather than his merely indicating that the authorities could

do so. Furthermore, at the time appellant was a 23–year–old Specialist Four with over 4¼ years of creditable service in the Army; and subsequent to the search he did ask for a lawyer, thereby indicating that he had some comprehension of his legal rights and some willingness to assert them under the circumstances prevailing. Among the factors that contradict the judge's finding of consent are that the appellant was under apprehension;[18] he was surrounded by his company commander, a military police investigator, a military police dog handler and his dog, and possibly either the first sergeant or another noncommissioned officer; the appellant's GT score was only 79; and he had only 10 years of formal education.

An additional–and weighty–factor to be considered here is that for the Government to carry successfully its burden of proving that the "consent" was, in fact, freely and voluntarily given, it must show that there was more than mere acquiescence to a claim of lawful authority. *Bumper v. North Carolina, supra. Accord, Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Schneckloth v. Bustamonte, supra; Johnson v. United States, supra; Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed.2d 654 (1921); *United States v. Aros, supra; United States v. Gillis, supra; United States v. Kinane*, 1 M.J. 309 (C.M.A. 1976); *United States v. Vasquez, supra.* When the searching official first asserts that he possesses a search warrant, the Supreme Court has ruled that it is acquiescence, and not true consent, which follows. The Court reasoned:

> When a law enforcement officer claims authority to search a home under a war-

---

**18.** While *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), rejected the notion that the fact of a lawful arrest alone may vitiate an otherwise valid consent (*see United States v. Matthews*, 603 F.2d 48 (8th Cir. 1979); *United States v. Tolias*, 548 F.2d 277 (9th Cir. 1977)), still it is a factor appropriately weighed in balancing the scales. The holding in *Watson* in no way contravenes the recognition by the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93

S.Ct. 2041, 36 L.Ed.2d 854 (1973), "that other courts have been particularly sensitive to the heightened possibilities for coercion when the 'consent' to a search was given by a person in custody." *Id.* at 240 n. 29, 93 S.Ct. at 2055 n. 29. Further, in light of our ultimate resolution of this case, we do not now resolve the lawfulness of the appellant's apprehension at that point; however, the lawfulness of the arrest was a factor consciously considered by the Supreme Court in *Watson.*

rant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent. *Bumper v. North Carolina, supra,* 391 U.S. at 550, 88 S.Ct. at 1792.

Further, it appears that the *Bumper* ruling was not diluted by the Supreme Court's judgment in *Schneckloth* that consent must be determined from the totality of the circumstances. Not only did the *Schneckloth* Court favorably quote the language from *Bumper* set out above, but also the various circuit courts have adhered to the *Bumper* line even after *Schneckloth.* See e. g., *United States v. Faruolo, supra; Holloway v. Wolff,* 482 F.2d 110 (8th Cir. 1973); *United States v. Bedford,* 519 F.2d 650, 660 (3rd Cir. 1975) (Rosenn, J., dissenting). While the results have varied in these cases depending upon exactly what the officers conducting the search had told the occupants before the "consent" was given, the analyses are consistent with *Bumper.*

In the case at hand, Captain Cole testified that it was fair to assume that the members of his unit knew that he could authorize a search of their lockers, even without their consent, if he had probable cause to do so; Mr. Crider told the appellant that the dog's alerting gave them probable cause to search his locker; and Captain Cole, who was standing right next to the appellant as Crider made this statement, did nothing to rebut what Crider had said. In legal effect, these facts are somewhat similar to the *Bumper* situation, where the searching authority told the occupant that he already had a warrant to search. Under these circumstances, the appellant might reasonably have inferred not only that Crider would *apply* for an authorization or that authorization *could* be obtained, *see United States v. Faruolo, supra,* but that probable cause already had been authorita-

tively determined by Captain Cole—in other words, that an authorization to search was a *fait accompli.* Considering the "psychological atmosphere" thus created, *United States v. Griffin,* 530 F.2d 739, 743 (7th Cir. 1976), quoting *United States v. Rothman,* 492 F.2d 1260, 1265 (9th Cir. 1973), it is certainly arguable that the appellant simply submitted to the claim of authority made by those surrounding him, rather than freely and voluntarily consenting to their request to search. *Bumper v. North Carolina, supra.* We need not decide this question, however, since the search can be upheld as authorized on probable cause.

### V

The testimony of Captain Cole and of Specialist Four Randal Davis,[19] Brandy's handler, indicates that when Cole visited Davis at the time of arranging for the use of a dog, Davis briefed Cole concerning the training and effectiveness of a drug–detection dog. Further, Davis explained to Cole that when the dog finds the drug he is trained to detect, he will scratch at it, much as an ordinary dog would respond to a ball with which he was playing. Also, Davis advised Cole of Brandy's past record of reliability; and he revealed to Cole that because a dog's nose is 60 times as sensitive as that of a human, the dog can detect in someone's clothing the odor of an item which no longer is on the individual's person—hence, that the dog sometimes has dead–scent alerts. Finally, Davis advised Cole to prepare the barracks for the dog's use by emptying it of personnel except for a noncommissioned officer on each floor.

On the morning of the inspection, Davis demonstrated Brandy's effectiveness, as well as the nature of her alert, to Cole in his office by handing Cole a package of marihuana[20] to hide. After Cole had secreted the package in his briefcase on top of his safe, Brandy conducted her search pat-

---

**19.** While Captain Cole could not remember all of the details of his conversation with Specialist Davis, the latter did specifically recall relating this information to Cole.

**20.** Davis represented to Cole that the package contained marihuana. While Cole did not open it to confirm for himself the nature of the contents, we have no reason to doubt that it was, in fact, marihuana.

tern through the office and alerted, by scratching with her paw, on the briefcase. Also, prior to the inspection's inception, Cole insured that the barracks had been emptied as Davis had instructed.

When Brandy alerted on the appellant's locker during the inspection, Cole was informed and allowed to see her in action for himself.[21] During a repeat visit around the appellant's room, Brandy again alerted at the locker by scratching at it with her paw— her customary form of alert.

 Upon these facts, we are satisfied that Captain Cole had been given enough information upon which he could conclude— and did conclude—that when Brandy alerted, there was probable cause to believe that contraband drugs would be found at the locale of the alert. Furthermore, he perceived that she had alerted on the appellant's locker. Hence, his authorization[22] was based upon the requisite probable cause, and it will, therefore, be sustained.[23]

The decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

**21.** During the inspection Brandy also had a number of dead–scent alerts, of which Captain Cole was advised.

**22.** During examination of Captain Cole, he was asked whether he authorized the search of the appellant's locker, to which he responded, "Yes, I did, but there really was no need to because Specialist Middleton opened his wall locker." We conclude from this somewhat ambiguous answer that, while Cole never was called upon to articulate his authorization because all present believed the appellant had consented to the search, Cole nonetheless had arrived at a conclusion of probable cause and had determined that an authorization was ap-

propriate. In fact, he testified that had the appellant not consented, he would have authorized the search anyway based upon the probable cause furnished by Brandy's alert.

**23.** On the facts of this case, Captain Cole's presence at the search did not transfigure him into a participant in the search so as to compromise his neutrality within the meaning of *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979). *Compare Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), *with Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973). *See United States v. Rivera*, 10 M.J. 55 (C.M.A.1980).