UNITED STATES, Appellee,

v.

Jeffrey M. BROWN, Private, U. S. Army, Appellant.

No. 40,009.
SPCM 14326.

U. S. Court of Military Appeals.

March 22, 1982.

For Appellant: *Captain Dennis E. Brower* (argued); *Colonel Edward S. Adamdewicz, Jr., Major James F. Nagle* (on brief); *Major Grifton E. Carden.*

For Appellee: *Captain Daniel T. Hartnett* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Major Robert B. Williams, Captain Margaret R. LaFrance* (on brief).

Opinion of the Court

EVERETT, Chief Judge:

Appellant was tried and convicted, despite his pleas, of having been an accessory after the fact to larceny and of conspiracy to commit forgery, in violation of Articles 78 and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 878 and 881, respectively. He was sentenced to a bad-conduct discharge, confinement at hard labor for 3 months, forfeiture of $200 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results except that, in accordance with the military judge's recommendation, he suspended execution of the bad-conduct discharge. The United States Army Court of Military Review affirmed in an unpublished opinion.

At trial, defense counsel moved to suppress three United States savings bonds found in appellant's wall locker during a health-and-welfare inspection. In addition, he moved to suppress any statements made by appellant as a result of the discovery of the savings bonds. The judge denied the motions. Thereafter, appellant, although pleading not guilty, entered into a confessional stipulation of fact.

We granted review of appellant's claim that the judge erred in ruling that this evidence was admissible, because it actually was "the product of an illegal search" and seizure occurring during a purported "health-and-welfare inspection" of appellant's unit. 10 M.J. 299. After examining the entire record, we conclude that the Government failed to establish that the activity which led to the discovery of the evidence in question was within the scope of the inspection or that its seizure was lawful.

I

Captain Wright, appellant's company commander, ordered the "health and welfare inspection." On the evening before, Captain Wright had attended a battalion Command and Staff meeting at which the battalion commander informed the officers present that a soldier in the battalion—in a company other than appellant's—recently "lost the bigger portion of both hands" in an explosion. The explosion had occurred in the soldier's barracks room when the soldier attempted to remove and repack the powder from small-arms ammunition apparently acquired during a recent field exercise. According to Captain Wright, the battalion commander advised all company commanders to hold inspections "to insure that none of . . . [the unit's] soldiers had any of this type of munitions or anything else that was dangerous to them."

Captain Wright decided to conduct the inspection the following morning immediately after the first morning formation. The normal duty day began at 6:30 a. m.; the inspection began one hour later. He instructed his platoon leaders and sergeants "to look for overall accountability, cleaness [sic], ready state of the equipment, they were to look for anything illegal such as, and I named munitions, pyrotechnics, fireworks, blanks, magazines, as in ammunition type magazines for weapons." He specifically mentioned the accident in the other company. Captain Wright testified that he chose to conduct a health-and-welfare inspection of the barracks, rather than an in-ranks inspection, because in his experience even good soldiers forget about small-arms ammunition or brass which they have put in their pockets or field gear.

Among Captain Wright's purposes for the health-and-welfare inspection "was to insure the serviceability and the readiness of the unit and also to look for any and all munitions, flammable materials, food in the barracks which would draw bugs, illegal contraband, things of this nature." It was intended to include

a half eaten pizza in a desk which draws bugs . . . dirty field gear that's not stored properly . . . ruck sacks, sleeping bags . . .

explosives . . . flammables . . . food in an unauthorized place . . . government property that wasn't suppose [sic] to have been there, wrenches . . .

[v]aluables left unsecured . . . .

fireworks ...

[d]rugs ...

[h]ard liquor ...

ruck sacks which had not been cleaned properly, boots which had not been cleaned properly, maintained ...

rubber boots, artic boots [to] see if they had any rips and tears.

Captain Wright said that if a uniform "was in a duffle bag," he "would go through the pockets. If it was hanging in a wall locker I would run my hands in and out of it very rapidly." When asked whether he would "shuffle through personal papers [and] letters," Captain Wright responded that "according to company policy," the members of his unit were "allowed ... to have a certain little space" in their wall lockers where they could "keep personal items"; as to that area of the wall locker he would look through "[v]ery hastily, not trying to be personal but if an individual was trying to hide something say like drugs, a knife which is illegal if it's over three and a half inches, yes I would" look through there. Captain Wright would "take the dust cover off the bed" in order "[t]o check for sheets," because where "you have two or three men in a closed room and they do not rotate their sheets and sleep with clean linen ... you have disease, you have sickness." The inspection would include areas under the bed and "in the ceilings. Many times the soldiers will take and place luggage and other heavy items which were not supposed to be placed in the fake ceiling which the ceiling will not support for any excessive length of time and I would look in that also."

Captain Wright had conducted four or five such inspections, unannounced, since assuming command three and a half months before. He stated that the troops were not informed whether they had passed such an inspection because they "know" without being told.

During the inspection Lieutenant Witworth, one of the inspecting platoon leaders, found the stolen bonds wrapped in a piece of paper in a pocket of appellant's jacket hanging in his wall locker. Captain Wright testified that he first learned of the discovery when a runner was sent to him with a message to that effect. Thereupon, he instructed the runner to ensure that appellant was advised of his rights and that the military police were notified, so that they could handle the investigation. Later, the captain approached appellant's room and asked Lieutenant Witworth whether appellant had been advised of his rights and whether the military police had been called. Receiving an affirmative response to each question, Wright admonished Witworth to be sure to continue the inspection. When the military police arrived, appellant was taken to the military police station where he made a statement implicating himself in a conspiracy to commit forgery.

The prosecution never called Lieutenant Witworth as a witness, so precisely what happened in appellant's room and why Lieutenant Witworth did what he did is unknown. Moreover, the stolen bonds were neither introduced in evidence nor described by the witnesses.

## II

While appellant initially contends in this Court that the activity ordered by Captain Wright and participated in by Lieutenant Witworth was not a valid health-and-welfare inspection at all, but rather was a disguised general search, we conclude that this contention lacks merit. As we recently observed in *United States v. Middleton*, 10 M.J. 123, 127–28 (C.M.A.1981), "the inspection has traditionally been a 'tool' for a commander to use in insuring 'the overall fitness of [his] unit to perform its military mission.'" (Footnote omitted.) This tool was thus employed here. There is no suggestion anywhere in the record—either in the testimony of the several prosecution and defense witnesses on the motion to suppress or in the circumstances surrounding the inspection—that the commander's concern was anything other than the general welfare and condition of his company. Indeed, in both its stated purposes and the manner of its performance, this is a classic example of the militarily necessary health-

and-welfare inspection, which we recognized in *Middleton* as appropriate and lawful.[1]

Nonetheless, our concern is not satisfied. The Government suggests in this Court that *Middleton* stands for the broad—indeed, boundless—proposition that once a valid health-and-welfare inspection has begun, there is no reasonable expectation of privacy anywhere in the barracks. However, *Middleton* itself belies such an expansive interpretation. There we found that while a valid inspection was being conducted, the particular incursion into the accused's locker was outside the scope of that inspection and, accordingly, could not be sustained without probable cause to proceed. Moreover, we did not intend to suggest then that a servicemember's personal papers could be scrutinized as part of an inspection.

While the scope of an inspection may be described in terms of area as it was in *Middleton*, it also may be described in terms of purpose. For instance, if the only purpose of an inspection is to make sure that all stereos and televisions are identified with a personal marking, it logically would be outside the scope of that inspection to look into the pockets of pants and jackets of a soldier whose barracks was being inspected. Likewise, on the record before us, it does not appear that any of the multiple purposes of the inspection as set forth by Captain Wright properly led Lieutenant Witworth into a folded piece of paper which he removed from appellant's jacket pocket.[2] While we recognized in *Middleton* the national defense imperative of health-and-welfare inspections, we also noted the vulnerability to abuse of this legitimate command tool. Accordingly, commanders and persons conducting such inspections must be ever faithful to the bounds of a given inspection, in terms both of area and purpose.

Equally troublesome is the *seizure* of the bonds once discovered. The Government has cited several opinions of federal courts of appeals in support of its position that it was proper for Lieutenant Witworth to seize stolen bonds in "plain view" during the inspection.[3] *See United States v. Crouch*, 648 F.2d 932 (4th Cir. 1981); *United States v. Mannino*, 635 F.2d 110 (2nd Cir. 1980); *United States v. Ochs*, 595 F.2d 1247 (2nd Cir. 1979), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *United States v. Duckett*, 583 F.2d 1309 (5th Cir. 1978). However, in each of those cases there was something indicative of criminality on the face of the seized documents which sustained the seizure. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Here, absent Lieutenant Witworth's testimony or even any description of the bonds, this Court has no basis in the record of trial to infer that the bonds appeared to have been stolen. Accordingly, even if Lieutenant Witworth properly retrieved the folded piece of paper from appellant's jacket pocket and unfolded it, the Government did not establish that he had any reason to seize the bonds which he found there.

For the foregoing reasons we conclude that the search and seizure were illegal and the bonds and statements derived from them should have been suppressed.

### III

The confessional stipulation of fact was apparently entered by the parties, with the judge's concurrence, on the assumption that it was a means of preserving the issue which the defense had raised by its motion to suppress. In light of this understanding

---

1. *See United States v. Hay*, 3 M.J. 654, 655–56 (A.C.M.R.1977), which we cited in *United States v. Middleton*, 10 M.J. 123, 127–28 n.7 (C.M.A.1981), for a discussion of the indicia of a health-and-welfare inspection. *See also* Mil. R.Evid. 313(b).

2. If Lieutenant Witworth had testified, he might have revealed some relationship between

his performance of the inspection and the discovery of the bonds. Absent testimony, we decline to speculate as to such a relationship.

3. Of course, if it was unlawful for the lieutenant to remove and unfold the paper in which the bonds were wrapped, the seizure was tainted from the outset.

by the parties, the stipulation should not be utilized to sustain the findings now that we have ruled the motion should have been granted. *See United States v. Bearchild*, 17 U.S.C.M.A. 598, 38 C.M.R. 396 (1968).

However, since it appears from the stipulation that the Government might have been able to prove its case with evidence then available that was not tainted by the unlawful search and seizure, we need not dismiss the charges. Accordingly, the decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judges COOK and FLETCHER concur.