**UNITED STATES, Appellee,**

v.

**Clarence A. BECKETT, Master Sergeant, U.S. Air Force, Appellant.**

No. 98–0038.
Crim.App. No. 32375.

U.S. Court of Appeals for
the Armed Forces.

Argued June 2, 1998.

Decided Sept. 30, 1998.

For Appellant: *Major Robin S. Wink* (argued); *Colonel Douglas H. Kohrt* and *Captain Margo Stone Newton* (on brief).

For Appellee: *Major Allen G. Erickson* (argued); *Colonel Brenda J. Hollis* and *Lieutenant Colonel Michael J. Breslin* (on brief).

*Opinion of the Court*

COX, Chief Judge:

Appellant was tried by a general court-martial convened at Luke Air Force Base (AFB), Arizona. The officer and enlisted members convicted him, contrary to his pleas, of wrongfully using cocaine and of disorderly conduct, in violation of Articles 112a and 134, Uniform Code of Military Justice.[1] We granted two issues for review. 48 MJ 412 (1997). In one, appellant contends that the military judge abused his discretion in denying a defense motion to suppress the results of a urinalysis. In the other, he

---

1. 10 USC §§ 912a and 934, respectively. The members acquitted appellant of a specification of wrongfully communicating a threat to his first sergeant, also charged as a violation of Article 134. Of a maximum possible sentence of a dishonorable discharge, confinement for 5 years and 1 month, total forfeitures, and reduction to E–1, appellant was sentenced to a bad-conduct discharge, confinement for 6 months, and reduction to E–3. The convening authority approved the sentence. The Court of Criminal Appeals affirmed in an unpublished opinion.

challenges his conviction of disorderly conduct, arguing that the evidence was insufficient to support a finding of guilty. As to the former, we hold that the military judge did not abuse his discretion. As to the latter, the evidence is sufficient to sustain the findings.

I

Appellant tested positive for cocaine as a result of a random urinalysis conducted on October 19, 1995. This urinalysis formed the basis of the charge of wrongful use of cocaine.[2] At trial, appellant moved to suppress the results of the urinalysis on the ground that the base urinalysis program in general was not being conducted entirely in accordance with applicable Air Force regulations. He also contended that the particular urinalysis sweep in which his urine was seized, in not conforming with the regulatory requirements, did not qualify as a valid military inspection under Mil.R.Evid. 313, Manual for Courts–Martial, United States (1995 ed.). *See United States v. Turner*, 33 MJ 40 (CMA 1991); *United States v. Bickel*, 30 MJ 277 (CMA 1990); *United States v. Middleton*, 10 MJ 123 (CMA 1981). As he did before the Court of Criminal Appeals, appellant contests the correctness of the military judge's decision to receive the evidence.

The Government offered the results of appellant's urinalysis as the product of a *bona fide* military inspection. Mil.R.Evid. 313. Upon the defense's motion, the burden shifted to the Government to establish "by a preponderance of the evidence that the evidence was not obtained as a result of an unlawful search or seizure...." Mil.R.Evid. 311(e)(1). The Government called two witnesses who administered the random urinalysis program at Luke AFB. The defense called a third witness also involved in the program. The witnesses all described the ongoing random urinalysis program at the base. All witnesses testified that the names used for the periodic sweeps were randomly generated by a computer, and that the command had no input into who would be selected.

The defense examination of these witnesses focused on whether some individuals summoned for random urinalysis occasionally slipped through the cracks and were not tested. The defense also focused on whether the witnesses happened to know if the official in charge of the base substance abuse program had been formally appointed in writing; whether the base substance abuse control committee met as often as required by regulation; and whether the witnesses were aware of any written directive by the installation commander instituting the random urinalysis program (other than the Air Force Instruction which required it).

The defense also called as a witness a lieutenant who along with appellant was among the 120 or so servicemembers also on the list randomly selected for testing. On the day the samples were collected, the lieutenant was on temporary duty, off the installation. When he returned to base several weeks later, no one notified him that he was to be tested.

The defense argument on the motion was: that there was no evidence that the ongoing random urinalysis program at Luke AFB was authorized by the installation commander (thus it was not an incident of command and, hence, not an inspection); that several aspects of the program at the base were not strictly in compliance with the applicable regulations; and that, on occasion, not everybody randomly selected was actually tracked down. The defense argued, in essence, that the entire urinalysis program at Luke AFB was compromised, and that none of the positive urinalyses derived therefrom could be received in evidence absent full probable cause.

The military judge entered the following findings and rulings:

Concerning the defense motion to suppress the results of a 19 October 1995 urinalysis, which is Appellate Exhibit VI, I hereby make the following essential findings of

---

2. Wrongful use of cocaine carries a maximum punishment of dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to E–1. Para. 37e(1)(a), Part IV, Manual for Courts–Martial, United States (1995 ed.).

fact: One, Air Force Drug Abuse Testing Program is governed by Air Force Instruction 44–120, dated 1 August 1994, Appellate Exhibit XII. Paragraph 2.5.1. of that AFI requires the installation commander to appoint the base Substance Abuse Office as OPR, office of primary responsibility, for the base urinalysis testing program.

The AFI does not require that this appointment be formalized in writing. Paragraph 2.5.2. requires that the base Substance Abuse Control Committee "distributes allocations to meet unit needs" and "ensures that all personnel assigned to the installation are subject to inspection testing." Paragraph 2.5.4. requires that the base medical treatment facility commander ensures that urine specimens are collected in accordance with the AFI. Air Force Instruction 36–2701, Chapter 6, which is Appellate Exhibit XI, also provides drug testing policy and procedural guidance for installation drug abuse testing.

Two, the accused was randomly selected by computer to be tested on 19 October 1995. There is no evidence that anyone intentionally placed his name on the test list for 19 October 1995 because of suspicion of drug abuse. Three, Lieutenant Laviolette, assigned to the accused's unit, that is, the 56 Component Repair Squadron was also randomly selected for testing on 19 October 95. However, due to his TDY status, he was not tested that day; nor was he tested on the day of his return, which was 7 November 1995, as he apparently should have been—see Appellate Exhibit XV, page 106, paragraph 1.d. No one specifically excused him from providing a urine sample; rather, he was apparently never notified.

Based on these essential facts, I reach the following legal conclusions: One, Luke Air Force Base has a functioning drug abuse testing program as evidenced by the testimony of Staff Sergeant Stuart, Mr. Brown, and Master Sergeant Berry.

Two, the evidence presented to support the assertion that base officials are not in full administrative compliance with all applicable requirements does not support the conclusion that the Air Force Drug Abuse Testing Program is not being properly performed at this installation such as to raise question as to the legal compliance with inspection testing, nor is there any evidence that the accused's selection for inspection testing on 19 October 1995 was, other than by completely random method. No one had focused on the accused as a suspected drug abuser. His selection for testing was by the same identical methods employed to select all other inspection testees on that date. There is no evidence this inspection was a subterfuge for a search.

Three, therefore, the means of acquisition of the 19 October 95 urinalysis result pertaining to the accused was through a valid inspection process and is, thus, admissible evidence under M.R.E. 313(b). Although not required by these facts, the prosecution has nevertheless met its burden, by clear and convincing evidence, that this evidence was collected through a valid inspection.

Accordingly, the military judge denied the motion to suppress the urinalysis results. The Court of Criminal Appeals found no error, nor do we.

■ The results of appellant's urinalysis are admissible—or not—under Mil.R.Evid. 313. The question is whether the specimen was taken under conditions amounting to a traditional military inspection, or whether it was seized without probable cause in violation of the Fourth Amendment to the Constitution. *See United States v. Turner, United States v. Bickel,* and *United States v. Middleton,* all *supra.* Minor deviations in the implementation of a broad regulatory scheme such as the military's urinalysis program do not render all samples and results inadmissible as a matter of law. *United States v. Strozier,* 31 MJ 283, 287–88 (CMA 1990); *United States v. Pollard,* 27 MJ 376, 377 (CMA 1989).

■ Our standard of review on a motion to suppress or admit evidence is whether the military judge abused his discretion. *United*

*States v. Ayala*, 43 MJ 296, 298 (1995). Under the circumstances herein, we are satisfied that the military judge did not abuse his discretion in concluding: that there was a duly-authorized, random-urinalysis-inspection program at Luke AFB; that the deficiencies, if any, in the operation of the program did not relate to the collection of appellant's sample; that appellant was identified for the inspection randomly, not as a result of being targeted; and that appellant's specimen was taken in the course of a valid military inspection. All of these conclusions were amply justified by evidence adduced at trial.

This issue is without merit.

## II

■ On November 14, 1995, when appellant's results from the October 19, 1995, test were reported to his command, appellant was immediately ordered to submit to another urinalysis. On January 3, 1996, appellant was summoned to his first sergeant's office and informed that the results of his November test were again positive.[3]

The Court of Criminal Appeals, 1997 WL 515832, described what happened then:

> Chief Master Sergeant (Chief) Larry Burns, appellant's first sergeant, informed him of the results of the commander-directed urinalysis.... Chief Burns then gave him a letter ordering another commander-directed urinalysis. When the Chief handed him the letter, the appellant said, "I'm sick and tired of this s–-t." The Chief left the room to make a copy of the letter, and while the appellant was standing in front of the Chief's desk, with Captain DL and Senior Master Sergeant (SMSgt) CT sitting nearby, the appellant said, "He's f-----g with the wrong guy."
>
> The Chief returned and handed the appellant a copy of the letter. As the appellant was leaving he gave the Chief a threatening look according to Captain DL. The Chief called the appellant back, asked if he was trying to intimidate him by his

glare and told him not to try to intimidate him. The appellant said he wasn't trying to intimidate him, and if the Chief perceived that as a threat, then that was "the Chief's problem." The appellant was then dismissed.

Unpub. op. at 1–2. Appellant's conviction for disorderly conduct arises from this episode. The general article provides, in pertinent part:

> Though not specifically mentioned in this chapter, all *disorders* and neglects to the *prejudice of good order and discipline* in the armed forces, [and] all conduct of a nature to bring discredit upon the armed forces ..., of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court.

Art. 134, UCMJ, 10 USC § 934 (emphasis added).

Congress delegated to the President the responsibility to establish sentence ceilings for offenses arising under the Uniform Code. Art. 56, UCMJ, 10 USC § 856. Pursuant to that authority, the President has established a sentence limitation—for disorders that are prejudicial to good order and discipline—of confinement for 1 month and forfeiture of two-thirds pay per month for 1 month. Para. 73e(1)(b), Part IV, Manual *supra*.

The President has noted further:

> "To the prejudice of good order and discipline" refers only to acts directly prejudicial to good order and discipline and not to acts which are prejudicial only in a remote or indirect sense. Almost any irregular or improper act on the part of a member of the military service could be regarded as prejudicial in some indirect or remote sense; however, *this article does not include these distant effects. It is confined to cases in which the prejudice is reasonably direct and palpable.*

---

**3.** No charges were brought against appellant as a result of the November 1995 test, and the results of it were not published to the court-martial. Similarly, appellant's positive, command-direct-

ed urinalyses of January 1996 and March 1996 were never the subject of court-martial charges and were never published to the court members.

Para. 60c(2)(a), Part IV (emphasis added); *see Parker v. Levy,* 417 U.S. 733, 754–56, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Accordingly, the President has defined "disorderly conduct" in this context to mean

conduct of such a nature as to affect the peace and quiet of persons who may witness it and who may be disturbed or provoked to resentment thereby.

Para. 73c(2), Part IV.

Thus, Congress supplied the statutory elements of (1) conduct and (2) prejudicial to good order and discipline. The President, in constructing sentence ceilings, further narrowed the range of conduct meriting criminal sanction. *Cf. United States v. Bivins,* 48 MJ 451 (1998). The military judge duly instructed the members in accordance with the statutory elements, as narrowed by the President.

Appellant's argument is that his conduct in Chief Burns's office did not rise to this level of disorderliness. Our standard of review on sufficiency of evidence matters is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see* Art. 67(c), UCMJ, 10 USC § 867(c) (1994).

Under the circumstances herein, it is readily understandable how a reasonable factfinder could have found appellant's conduct to be disorderly, as defined. Appellant was a master sergeant with over 14 years of military experience. That his conduct in Chief Burns's office was prejudicial to good order and discipline in the armed forces seems self-evident. The court members drew the conclusion that it also "affect[ed] the peace and quiet of persons who ... witness[ed] it and ... disturbed or provoked [them] to resentment thereby." This conclusion was certainly based on evidence, as the three witnesses to the incident themselves testified to what they saw, heard, and felt. We do not stand in the shoes of the factfinder in this regard. *See Jackson v. Virginia, supra.*

The issue is without merit.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Judges SULLIVAN and CRAWFORD concur.

GIERKE, Judge, with whom EFFRON, Judge, joins (concurring in part and dissenting in part):

I agree with the majority's holding that the results of the urinalysis were properly admitted in evidence against appellant. I disagree with the majority's holding that the evidence is legally sufficient to support appellant's conviction of conduct that was "of such a nature as to affect the peace and quiet of persons who may witness it and who may be disturbed or provoked to resentment thereby." Para. 73c(2), Part IV, Manual for Courts–Martial, United States (1995 ed.).

Appellant's conduct was witnessed by a captain and a senior master sergeant. Both were senior to appellant in military grade and position. Neither thought appellant's conduct warranted intervention or an on-the-spot correction.

Captain Langston testified that appellant's comment was softly muttered "almost under his breath" and "was a statement made out of more frustration than anything." When asked what action he took after hearing appellant's comment, Captain Langston testified that he took "no personal action." He merely looked across the room at Senior Master Sergeant (SMSgt) Tinney, "who was looking back at [him] with a surprised look, quizzical." When asked if he was "disturbed or outraged," Captain Langston testified that he took no action. He explained, "That kind of language is fairly common on the flight line and, you know, the language itself doesn't bother me." Captain Langston did not mention appellant's conduct to any superiors until 24 hours later at a meeting called by his superior.

SMSgt Tinney testified that when appellant commented that the first sergeant was "f___ing with the wrong person," he "was just releasing frustration." He thought that the comment "was inappropriate, considering the situation." He interpreted the conversa-

tion about the "glare" as a question from the first sergeant asking appellant if he was trying to intimidate him and appellant responding that he was not trying to intimidate him. He did not interpret appellant's conduct as "any personal threat."

Chief Master Sergeant (CMSgt) Burns testified that he was not present when the comment about "f____ing with the wrong person" was made. He testified that he asked appellant if "that glare was meant to intimidate [him]." Appellant said that he was not trying to intimidate him. CMSgt Burns then said "fine" and dismissed appellant. On cross-examination, CMSgt Burns testified that he did not reprimand appellant because appellant "had more than enough problems at that time for me to add to his problems on that particular day."

The prosecution's case thus consisted of a comment, made out of CMSgt Burns's presence, that neither Captain Langston nor SMSgt Tinney considered to warrant a response or corrective action and a "glare" that CMSgt Burns initially interpreted as threatening; but he then dismissed appellant without further action when appellant responded that he was not trying to intimidate him. In short, three of appellant's military superiors witnessed his behavior, and none of them thought that it warranted correction or reaction. In my view, this is insufficient for any reasonable factfinder to conclude that appellant's conduct affected the peace and quiet of the three persons who witnessed it or that those three persons were "disturbed or provoked to resentment thereby."