UNITED STATES, Appellant,

v.

Staff Sergeant Francis A. VALENZUE-LA, 555–31–7543, United States Army, Appellee.

ACMR MISC 8701361.

U.S. Army Court of Military Review.

31 Aug. 1987.

For Appellant: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Captain Eva M. Novak, JAGC, Captain Karen L. Taylor, JAGC (on brief).

For Appellee: Colonel John T. Edwards, JAGC, Major Eric T. Franzen, JAGC, Captain Lorraine Lee, JAGC (on brief).

Before DeFORD, GILLEY and CARMICHAEL, Appellate Military Judges.

## OPINION OF THE COURT

GILLEY, Judge:

The government appeals, pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 (Supp. II 1984) [hereinafter UCMJ], and Manual for Courts-Martial, United States, 1984, Rule for Courts-Martial 908(b) [hereinafter M.C.M., 1984], a ruling by the military judge suppressing results of a urinalysis implicating appellee. These test results are essential evidence with respect to Specification 2 of the Charge alleging wrongful use of cocaine, in violation of Article 112a, UCMJ.

### I. *Facts*

Appellee serves in a "rapid deployment" company of an infantry division stationed at Fort Ord, California. In December 1986, Captain (CPT) Barese, the company commander, established, with concurrence of his battalion commander, a urine testing program for his soldiers returning from leave on or after 1 January 1987. The theory behind the testing program was that CPT Barese believed soldiers who are away from the unit on leave are more susceptible to peer pressure to use drugs illegally than those present for duty every day.[1] His purpose in conducting this testing was to determine unit readiness. Deterrence through disciplinary or other adverse action was a secondary purpose of this testing. The testing program pertained only to soldiers returning from leave; soldiers on passes were not included.

On 13 January 1987, following his return from leave, appellee was directed to provide a urine sample for drug testing pursuant to CPT Barese's program. Appellee was among the first 37 soldiers so tested, with a total of 60 soldiers having been tested by the time appellee's court-martial convened. Appellee tested positive.

At trial, appellee moved to suppress the results of the urinalysis. Notwithstanding the military judge's finding that CPT Barese's motivation for testing was proper, the military judge found the company commander lacked military necessity for this inspection program. He stated the program (a) was not based on a proven premise—that soldiers on leave were more susceptible to peer pressure to use drugs illegally; (b) was not a necessary inspection in view of the other adequate times for urine testing for drug abuse; (c) "conditioned" a soldier's statutory and regulatory right to leave on providing a urine sample for drug testing when the soldier returns; and, (d) could be viewed as arbitrary because this testing program did not cover absences for passes up to four days. He determined "factually" that the inspection was therefore "changed" into a search without probable cause, "and an unreasonable intrusion upon a soldier's right of privacy".[2]

### II. *Standard of Review*

▌ When he entered his findings as to the admissibility of the test results, the military judge stated he was making his findings "factually." Stating that findings are made "factually," however, does not

---

1. The military judge found the testimony of the company commander clear and convincing on his motivation for testing.

2. The judge's findings included the following: I further find that, by the commander's testimony, Captain Barese, his unit did not have a drug problem, and no more than ordinary need to implement extraordinary measures.

I further find, factually, that the commander's policy and practice commits soldiers to urinalysis testing as a condition of going on leave, and essentially changes what is labeled an inspection into a search without probable cause.

foreclose appropriate action on an Article 62 appeal if the matter is one of law. *United States v. Rodriguez*, 23 M.J. 896 (A.C.M.R.1987). Thus, the issue here is whether the military judge's conclusions—that there was a lack of "military necessity" for the urine collection and testing, and that taking this urine sample was "unreasonable" in view of the privacy due the appellee—were erroneous as a matter of law. *See United States v. Burris*, 21 M.J. 140, 144 (C.M.A.1985); *United States v. Middleton*, 10 M.J. 123, 133 (C.M.A.1981). We hold, under both Mil.R.Evid. 313[3] and the fourth amendment, this was a permissible inspection. The evidence obtained from the inspection, therefore, was admissible.

### III. *Reasonableness of Inspection*

■ Military Rule of Evidence 313 addresses the admissibility of evidence obtained from inspections. In 1984, Rule 313(b) was amended to provide specifically that "[a]n order to produce body fluids, such as urine, is permissible in accordance with this rule." The amendment, based in part on the holdings in *Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983), and *United States v. Middleton*, 10 M.J. at 128–129, was designed to clarify the standard to be applied in inspection scenarios. *See generally* M.C.M., 1984, Analysis at A22–19–24. Although the Rule is silent as to actual methods or techniques for conducting inspections, the test is reasonableness. *See* S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 236 (2d ed. 1986). Urine testing has been upheld under the amended rule. *United States v. Johnston*, 24 M.J. 271 (C.M.A. 1987).

It should be noted the case law on which the amendment to Rule 313(b) was based

---

3. Manual for Courts-Martial, United States, 1984.

Rule 313. *Inspections and Inventories in the Armed Forces*

(a) *General rule.* Evidence obtained from inspections and inventories in the armed forces conducted in accordance with this rule is admissible at trial when relevant and not otherwise inadmissible under these rules.

(b) *Inspections.* An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband. An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion and shall comply with Mil.R. Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.

Because he found the commander's actions improper, the trial judge immediately found the test results "fruits" of the impropriety and precluded them under the exclusionary rule. Recent decisions, however, indicate such analysis might be incomplete. The question of whether the exclusionary rule should apply to a good faith, but improper, inspection by a commander, including consideration of fourth amendment standards, must await consideration in an appropriate case. *See Illinois v. Krull*, — U.S. —, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (good faith exception applied to admit results of an inspection made in objectively reasonable reliance on a statute authorizing such an inspection; state supreme court had found the statute unconstitutional); *cf. New Jersey v. T.L.O.*, 469 U.S. 325, 333 n. 3, 105 S.Ct. 733, 739 n. 3, 83 L.Ed.2d 720 (1985); *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

addressed the inspection issue under the auspices of the fourth amendment's protection against unreasonable search and seizure. In *Murray v. Haldeman*, 16 M.J. at 81, the Court of Military Appeals considered the reasonableness of a Navy compulsory urinalysis program and determined the seizure in question was reasonable under the fourth amendment. The court's decision recognized that the exigencies of military necessity must be considered in any "reasonableness" formulation. *Id.* This recognition is particularly so with regard to inspections designed to detect illegal use of drugs because drug usage cannot be tolerated in a military environment. *See, e.g., United States v. Johnston*, 24 M.J. at 274 ("special interest in the military in ferreting out illegal drugs and protecting the health and fitness of its members"); *United States v. Trottier*, 9 M.J. 337, 346 (C.M.A.1980); *United States v. Unrue*, 47 C.M.R. 556, 559–60 (C.M.A. 1973); *Committee for GI Rights v. Callaway*, 518 F.2d 466 (D.C.Cir.1975); *Drug Abuse in the Armed Forces of the United States: Oversight Update, Hearing Before the Select Committee on Narcotics Abuse and Control*, 96th Cong., 1st Sess. 7 (1980) (statement of Assistant Secretary of Defense for Health Affairs that "drug use has fostered fragmentation within units promoting divisiveness between drug users and non-drug users").

▮ With this background in mind, and in light of the fact that inspections designed to protect unit health and fitness are a "permissible deviation from what may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion which a servicemember must expect in military society," *United States v. Middleton*, 10 M.J. at 128

(quoting *United States v. Roberts*, 2 M.J. 31, 36 (C.M.A.1976)), we examine the reasonableness of the incident inspection. In all respects, we deem the inspection reasonable.

▮ First, the commander's judgment to inspect rested on an *objective articulated reason*, that is, to insure the readiness of his unit. Drug use is a direct threat to that readiness. The military judge, though, did not believe CPT Barese's reason for testing for readiness was sufficient. We find, however, that, unless a commander uses an inspection as a subterfuge for an illegal search or bases his inspection on irrational grounds, the military judge should not substitute his judgment for that of the commander on when to test for readiness. Extraordinary responsibilities inherent in command typically justify inspections. *United States v. Gebhart*, 28 C.M.R. 172, 176 n. 2 (C.M.A. 1959). Furthermore, an inspection to determine readiness "may be a routine matter or special, dictated by events, or any number of other things, including merely the passage of time ...," directed by a commander who desires to know the status of his organization or any part of it. *United States v. Lange*, 35 C.M.R. 458, 461 (C.M.A.1965) (citing with approval the unreported Army Board of Review opinion in *United States v. Lange*). The inspection is designed to determine whether corrective measures are required. Moreover, the Court of Military Appeals has not required a specific showing of adverse impact before an inspection is found permissible. *United States v. Middleton*, 10 M.J. at 129. The commander, then, exercises broad discretion in deciding when military readiness calls for an inspection of his soldiers.[4]

---

4. The military judge's conclusion that the unit did not have a drug problem was simply wrong. In fact, the unit had at least four other soldiers illegally using drugs in the preceding twenty months during which this company commander had been in command. The threat to readiness, thus, was real, though such an inspection as this one does not have to be tied to drug abuse in the unit. We note that *Murray v. Haldeman*, 16 M.J. at 79–80, upheld urine testing of service members returning from leave, citing *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95

L.Ed. 152 (1950). Importantly, the Supreme Court in *Feres* recognized service members on furlough are not under the compulsion of orders or duty. *Feres*, 340 U.S. at 146, 71 S.Ct. at 159. This recognition was cited in *Murray v. Haldeman*, 16 M.J. at 79, for the proposition that leave status can change a soldier's usual relationship with his service. Thus, a soldier on leave, away from the structured atmosphere of his unit, would likely be more tempted to use illegal drugs. CPT Barese's articulated reason

Also, the testing here was not a subterfuge to search requiring probable cause. *See, e.g., United States v. Austin,* 21 M.J. 592 (A.C.M.R.1985).

Second, the degree of intrusion by testing was reasonably related in scope to insure readiness. Soldiers quickly grow accustomed to military inspections. They have no more right to privacy in urine test inspections than they have in what have been called "traditional military inspections" of lockers and personal items. *See United States v. Middleton,* 10 M.J. at 127.[5] We judicially note that since 1981 the military services have increasingly used urine testing for virtually all servicemembers to determine one aspect of readiness. Accordingly, soldiers rarely have a justifiable expectation of privacy from urine testing to determine military readiness.

Finally, there is no indication the testing was done in an unreasonable, degrading, improper, or illegal manner. *See* Mil.R. Evid. 313(b). Normal unit procedures were followed. As such, the actual testing process chosen was reasonable.

We last consider the rationale on which the military judge based his decision to suppress. The military judge believed adequate urine testing could occur at other times. The possibility of tests being conducted at different times or under another program, however, is not controlling. The critical issue is whether the test, when and as conducted, was reasonable. We hold that it was.

The military judge further believed that failure to include soldiers on pass was unreasonable. In the same vein, he opined inspecting on return from leave "conditioned" leave on submitting to a urine test. As to passes, the testing scheme was not unreasonable. Commanders usually award passes to deserving soldiers for special occasions and in special circumstances. As to "conditioning" leave on submitting to testing, we find his conclusion neither supported in fact nor logic. The inspection program established by the company commander eventually would cover all unit soldiers. Since all soldiers anticipate urine testing, it cannot be seen as any restraint that they realize testing will occur when they return from leave, or any other particular time, which foreseeably could be announced or unannounced. The only "chilling effect," then, is on a soldier's motivation to use drugs illegally while on leave, clearly a purpose compatible with benefitting soldiers' health and morale, and thereby increasing military as well as individual effectiveness and performance. *See* Army Regulation 630–5, Personnel Absences: Leave and Passes, paras. 2–1 and 11–3 (1 July 1984).[6]

In conclusion, this urine testing was a permissible, reasonably-conducted inspection under Mil.R.Evid. 313 and was reasonable under the fourth amendment as well. Accordingly, the appeal of the United States is granted. The ruling of the military judge suppressing the results of the urinalysis test is vacated. The record will

---

for this urine testing program, therefore, cannot be said to be irrational. Furthermore, frequent administrative inspections are permissible when close regulation is required. *New York v. Burger,* —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (frequent inspection of junkyards for stolen automobiles or parts).

5.  *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), reasserted the traditional rule that the rights of soldiers must yield somewhat to meet "overriding demands of discipline and duty". 444 U.S. at 354, 100 S.Ct. at 599 (quoting *Burns v. Wilson,* 346 U.S. 137, 140, 73

S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953) (plurality opinion)).

6.  Army Regulation 600–85, Personnel-General: Alcohol and Drug Abuse Prevention and Control Program (3 November 1986), does not preclude court-martial for this offense. The "Fitness for duty" bar to court-martial in that regulation requires individualized "reasonable suspicion" less than probable cause, which is not present in this case. *Id.* at Table 6–1, p. 43. The commander's basis for testing appellee, that soldiers are more susceptible to peer pressure when away from the company on leave, is not, as a matter of law, individualized suspicion.

be returned to the military judge for action not inconsistent with this opinion.[7]

Senior Judge DeFORD and Judge CARMICHAEL concur.

## APPENDIX

United States Army Court of Military Review

MISC ACMR 8701361

United States, Appellant,

v.

Staff Sergeant Francis A. Valenzuela, 555–31–7543,

United States Army, Appellee.

Before DeFORD, CARMICHAEL, and GILLEY, Appellate Military Judges.

## ORDER

WHEREAS, the government has appealed, pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. sec. 862 (Supp. II 1984), the military judge's ruling suppressing the results of a urinalysis test; and,

WHEREAS, the parties have submitted pleadings on the correctness in law of the military judge's ruling, it is by this Court, this day,

ORDERED:

That the appeal of the United States is granted. The ruling of the military judge suppressing the results of the urinalysis test is vacated. The record will be returned to the military judge for action not inconsistent with this order. An opinion has been prepared and will be filed in due course.

Date: 24 July 1987

FOR THE COURT:

/s/ WILLIAM S. FULTON, JR.

Clerk of Court

---

7. This opinion explains our order of 24 July 1987 (Appendix).