**UNITED STATES, Appellee,**

v.

**Private E1 Barry S. BICKEL, 315–92–0777, United States Army, Appellant.**

**ACMR 8800197.**

U.S. Army Court of Military Review.

4 Nov. 1988.

For Appellant: Lieutenant Colonel Russell S. Estey, JAGC, Major Eric T. Franzen, JAGC, Captain Jon W. Stentz, JAGC (on brief).

For Appellee: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Gary L. Hausken, JAGC, Captain Richard D. Rubino, JAGC (on brief).

Before ADAMKEWICZ,* MYERS, and SMITH, Appellate Military Judges.

## OPINION OF THE COURT

ADAMKEWICZ, Senior Judge:

Appellant was convicted of wrongful use of marijuana and absence without leave in violation of Articles 112a and 86, Uniform Code of Military Justice, 10 U.S.C. §§ 912a and 886, respectively [hereinafter UCMJ]. Appellant was sentenced to a bad-conduct discharge, confinement for four months, and forfeiture of $438.00 pay per month for four months. The convening authority approved the sentence.

On 10 June 1987 appellant submitted a urine sample which tested positive for marijuana. Appellant's company commander received the test results on 17 July. On 21

---

\* Senior Judge Adamkewicz took final action in this case prior to his retirement.

July, appellant rendered a second urine sample along with 27 other soldiers who were randomly selected to participate in the test. Appellant's second urinalysis was directed by the company commander pursuant to that commander's policy letter which required all soldiers who test positive for controlled substances to submit to a second urinalysis during the following month's urinalysis testing (Appendix).[1] After the second urinalysis, the commander received information regarding appellant's appearance and duty performance which led him to suspect that appellant would fail the test again. Appellant's second urine sample which tested positive for marijuana is the basis for the wrongful use of marijuana conviction (Charge I and its Specification).

Appellant asserts that the military judge erred by failing to grant appellant's motion to suppress evidence of the second urinalysis test. In his brief before this court, appellant recognizes the legitimate concerns of commanders in pursuing a drug test screening program to assure unit readiness and fitness for duty, but argues that "the use of test results should be limited, consistent with the goals of the Military Rules of Evidence and Army Regulation, so as to safeguard the constitution-ally protected right of the soldier to be free from unreasonable and individualized searches and seizures which are based on less than probable cause." He argues that the second urinalysis conducted pursuant to the commander's policy did not qualify as an inspection under Manual for Courts-Martial, United States, 1984, Mil.R.Evid. 313(b) [2] and was precluded as evidence at a court-martial under the limited use policy in Army Regulation 600–85, Personnel-General: Alcohol and Drug Abuse Regulation (3 November 1986) [hereinafter AR 600–85].[3]

■ At trial, the military judge found that although the second urinalysis was not based on probable cause, it was the commander's intention to comply with his guidelines set out in a policy letter regarding retesting of individuals who tested positive for controlled substances the previous month. The policy letter was issued by the commander because he was concerned that his unit would be affected by substance abuse. The military judge also concluded that regardless of the fact that the commander, in the first paragraph of the policy letter, had expressed an intent to punish

---

1. Although not formally admitted at trial, we will treat and consider the policy letter as an Appellate Exhibit based on the fact that the parties at trial and on appeal have relied on the letter in their consideration and discussion of the issue in question.

2. Mil.R.Evid. 313(a) states that evidence obtained from inspections is admissible at a court-martial. Mil.R.Evid. 313(b) defines an inspection as follows:

An inspection is an examination of the whole or part of a unit ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit.... An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, ... sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband. An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made

for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If the purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit ... and was not previously scheduled; (2) specific individuals are selected for examination; or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule.

3. The "limited use policy" under AR 600–85, para. 6–4a (1) prohibits the use of "[m]andatory urine ... test results taken to determine a soldier's fitness for duty and the need for counseling, rehabilitation, or other medical treatment or in conjunction with a soldier's participation in ADAPCP" as evidence against a soldier in actions under the Uniform Code of Military Justice.

As requested by appellant, we take judicial notice of the entire 3 November 1986 edition of AR 600–85.

soldiers who used controlled substances, the overall "tenor [of the policy letter] establishes that [the commander's] primary concern was the health, welfare, and morale of his unit." The judge found that although the commander's purpose for the rescreening was consistent with both an inspection and fitness for duty rationale, the commander's primary purpose was to ensure the readiness of his unit and was not intended to be used to gather evidence for disciplinary or other adverse action. The judge further found that the rescreening policy was implemented as a result of the commander's concern for the "safety of his troops" and the detrimental effect of drug abuse on appellant as well as the other soldiers in the unit. The military judge concluded that the rescreening procedures in this case were not based on a policy of predetermined reasonable suspicion to test a soldier's fitness for duty nor an individualized suspicion which would have precluded the use of the test results for disciplinary purposes under the "limited use policy" in AR 600-85. *See* AR 600-85, paras. 6-4 and 10-3a(1), and Table 6-1, p. 43. His findings are supported by the record and adopted by us.

The Supreme Court has repeatedly held that the purpose of the Fourth Amendment's proscription of unreasonable searches and seizures is "to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed. 2d 930 (1967). The standard test of "reasonableness" imposed by the Fourth Amendment upon the exercise of discretion by government officials, *Delaware v. Prouse*, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660 (1979), "is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that

the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed. 2d 447 (1979).

■ The Court of Military Appeals did such balancing of the factors involved when it held in *Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983), that the Armed Forces' compulsory urinalysis program constituted a reasonable "seizure" and thereby did not violate a servicemember's Fourth Amendment protection from unreasonable searches and seizures. *See United States v. Middleton*, 10 M.J. 123 (C.M.A.1981). Likewise, in our balancing of the importance of the substantial military and national interest served by urinalysis examination, the degree to which urinalysis testing serves that interest, and the diminished expectation of privacy in military life, we are satisfied that the local drug retesting program under scrutiny qualifies as a reasonable search and seizure under the Fourth Amendment. Neither probable cause, *Committee for GI Rights v. Callaway*, 518 F.2d 466, 476-77 (D.C.Cir.1975); *United States v. Valenzuela*, 24 M.J. 934 (A.C.M.R.1987), nor any quantum of individualized suspicion is required. *United States v. Martinez-Fuerte*, 428 U.S. 543, 560-62, 96 S.Ct. 3074, 3084-85, 49 L.Ed.2d 1116 (1976). *See also Delaware v. Prouse*, 440 U.S. at 654-55, 99 S.Ct. at 1396-97 (in some situations, the balance of interests precludes the requirement of some quantum of individualized suspicion as a prerequisite to a constitutional search or seizure).[4]

The commander's decision to conduct retesting of all soldiers who tested positive for controlled substances on the previous month's test is not unreasonable when balanced against the need to protect the unit's health and fitness. *Murray v. Haldemen*, 16 M.J. at 80-82; *United States v. Valenzuela*, 24 M.J. 934 (A.C.M.R.1987). Testing urine for use of controlled substances is considered a reasonable intrusion conducted to ensure the readiness of the units and

---

4. It would thus appear that the restraints on a commander's inherent power contained in Mil. R.Evid. 313(b) and AR 600-85, and in issue here are not constitutionally mandated. *See also* comments of Judge Cox in *United States v.*

*Moore*, 23 M.J. 295, 299 (C.M.A.1987) (Cox, J., concurring in the result), questioning the Fourth Amendment foundation for the Court of Military Appeals' decisions finding a reasonable expectation of privacy in military barracks.

is a practice which soldiers have come to expect in the military. *United States v. Valenzuela*, 24 M.J. 934. *Cf. New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (where business owners' privacy interests are weakened and the government interests in regulating those particular businesses are heightened, a warrantless inspection of commercial premises is reasonable within the meaning of the Fourth Amendment). A commander has "broad discretion in deciding when military readiness calls for an inspection of his soldiers." *United States v. Valenzuela*, 24 M.J. at 937. While the urinalysis testing policy under attack is broader than those in other commands, the desirability for such a policy will not be questioned by us as long as the policy is reasonable and is justified by a compelling military interest in maintaining the readiness of the command. *See United States v. Sartin*, 24 M.J. 873, 874 (A.C.M.R.1987), *petition denied*, 26 M.J. 60 (C.M.A.1988).

In this case, the commander was attempting to assure the readiness of his unit and of soldiers in appellant's situation in particular. He was not attempting to conduct a search without the required probable cause. *United States v. Valenzuela*, 24 M.J. at 938. Nor was the commander attempting to conduct a search directed at a particular soldier based on individualized "reasonable suspicion." *Cf. Id.* at n. 6 (commander's basis for testing accused, that soldiers are more susceptible to peer pressure when away from the company on leave, is not individualized suspicion). *See also* AR 600–85, Table 6–1, p. 43 (urine tests directed by the commander based on his reasonable suspicion that a soldier has ingested drugs cannot be used as evidence for disciplinary action against that soldier).

■ Further, the policy established by the commander and the retesting that appellant endured in this case was a reasonable inspection. *See generally New York v. Burger*, 107 S.Ct. 2636 (three-step analysis used to determine whether a warrant-

less inspection of a junkyard conducted pursuant to an inspection statute was reasonable under the Fourth Amendment). First, the government has a substantial interest in ensuring the readiness and welfare of soldiers, especially in light of the increased use of controlled substances among soldiers and the easy access soldiers have to such substances. Second, urine testing conducted as an unit inspection serves the government's substantial interest in detecting and deterring illegal drug use. Third, the manner in which urinalysis testing in the U.S. Army and this commander's retesting are conducted provide a constitutionally adequate substitute for a warrant. Soldiers are on notice that use of illegal drugs cannot and will not be tolerated in the military. They are aware that the military conducts urine tests as part of unit inspections in order for the commander to determine the readiness, health and welfare of his soldiers. The policy letter in this case, which was posted on the unit bulletin board, told the soldiers in the unit that the command believed drug use was "detrimental to unit performance, compromises individual integrity and ultimately endangers the health and welfare of the abuser and those who work around him." The policy letter clearly advised appellant and his cohorts that whenever a soldier tested positive for illegal drugs, a second urine test would be conducted the following month during an urinalysis test conducted as an unit inspection. Thus, the policy letter informed appellant how and when such re-inspections would take place. The retesting policy in the unit met the requirements of a lawful inspection under Mil.R. of Evid. 313(b) and *New York v. Burger*.

There is no indication that the urinalysis in this case was conducted in an "unreasonable, degrading, improper, or illegal manner." *United States v. Valenzuela*, 24 M.J. 938. Appellant rendered the second urine sample during the course of a regularly conducted random testing of the unit's soldiers. Appellant was one of 28 soldiers tested that day.[5] There is no evi-

5. Another soldier that had tested positive in June would have been retested in July but for his unauthorized absence.

dence that the collection of the urine sample from appellant was conducted differently from unit urine testing in the past. There is no indication that the retesting policy was instituted as a method of stacking charges or gathering evidence against a soldier or was directed at any soldier in particular.

 Even the fact that the commander may have suspected that appellant would have a second positive urinalysis based on appellant's intervening appearance and duty performance is of no consequence. For example, commanders are not precluded from conducting a barracks inspection because they believe that they may find violations during the inspection. It is when commanders use the inspection as a subterfuge for a search they wish to conduct in a particular area or of a specific person that the fruit of the search will be precluded absent probable cause. *See* Mil.R.Evid. 313(b) ("An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule."). An inspection, however, will not be unconstitutional or become an improper search merely because it is likely that evidence of a crime may be discovered, *New York v. Burger*, 107 S.Ct. at 2649–2651, and criminal prosecution will result therefrom. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. at 530–31, 87 S.Ct. at 1731–32.

Paragraph 10–3a (1) and Table 6–1, page 43, of AR 600–85 preclude the use of the results of urine tests in UCMJ actions when the test was directed based on a "reasonable suspicion that [the] soldier is using a controlled substance" and the urine test is conducted to determine the "soldier's fitness for duty and the need for counseling, rehabilitation, or other medical treatment." AR 600–85, para. 10–3a (1). *See also* AR 600–85, para. 6–4a. In the instant case, as the military judge found, there was no reasonable basis to suspect that appellant had recently ingested marijuana either based on a prior positive urinalysis test from urine collected over 40 days prior to the test in question or on the recent behavior of appellant. The second urinalysis was conducted as a result of a policy previously established by the commander for rescreening those individuals who tested positive the previous month. Thus, the rescreening was not specifically directed at appellant.

In accordance with AR 600–85, para. 10–3a (3) and Mil.R.Evid. 313, test results of urine collected and tested pursuant to an inspection can be used as evidence against a soldier at a court-martial. In this case, the commander's primary purpose in establishing a retesting procedure was to ensure the readiness of his unit. Any disciplinary or adverse action that resulted from these test results was secondary. The retesting policy was not directed at any soldier in particular and all soldiers in the unit were on notice that a retest would be conducted in the event that their urine tested positive for controlled substances. *See United States v. Johnston*, 24 M.J. 271 (C.M.A. 1987) (mandatory monthly drug testing of naval brig staff members pursuant to regulation met all requirements for lawful inspection).

We believe that in this case the commander was conducting a valid inspection pursuant to Mil.R.Evid. 313 and that the military judge did not err in admitting the urine test results.

The findings of guilty and sentence are affirmed.

Judge MYERS concurs.

SMITH, Judge, dissenting:

Appellant asserts that the military judge erred by failing to grant his motion to suppress the evidence of the second urinalysis. He argues first that the policy letter (Appendix) did not create an inspection under Mil.R.Evid. 313(b) because the purpose of a second test was punitive and not motivated by inspection standards (unit health, welfare, and readiness, etc.), but rather based upon the commander's "individualized 'reasonable suspicion' less than probable cause." *United States v. Valenzuela*, 24 M.J. 934, 938 n. 6 (A.C.M.R.1987).

Appellant then argues that because the second test was not an inspection and was based upon reasonable suspicion rather than probable cause, it was a command directed test to determine appellant's fitness for duty pursuant to para. 10-3a (1), Army Regulation 600-85, Personnel-General: Alcohol and Drug Abuse Regulation (3 November 1986) [hereinafter AR 600-85].

Once a soldier has been identified as positive for drug use it follows that a commander having knowledge of that fact would suspect the soldier of drug use. Under those circumstances, a retest based solely on the first positive, whether directed by policy letter or individually directed, is a command directed test "[t]o determine fitness for duty and the need for counseling, rehabilitation, or other medical treatment." Table 6-1, p. 43, AR 600-85. *See also* paras. 4-6a and 10-3a (1), AR 600-85. The regulation in Note 2 of Table 6-1 states that "[t]his category refers to a soldier for whom the commander has a reasonable suspicion has ingested drugs or alcohol as opposed to probable cause that the soldier has ingested drugs or alcohol" and further specifically prohibits use of test results for disciplinary action under the Uniform Code of Military Justice.

I believe that AR 600-85 recognizes the limits placed upon us by the Fourth Amendment, applies, and is dispositive. The majority's position that appellant was not singled out is a legal fiction created in order to fit inspection rationale. The commander specifically by name directed that appellant be tested among 27 other soldiers randomly selected. My brothers hold that the second test was a "reasonable," permissible inspection. They balance the need for a drug free military against the intrusion. I find their reasoning understandable and acceptable only if I first accept that soldiers are not protected by the Fourth Amendment.[1] This search was beyond question focused on a single individual, based upon stale information, and conduct-

ed without probable cause.[2] In almost 30 years of military service as an enlisted soldier, line officer, and attorney I have seen few, if any, procedures I find more dangerous to the rule of law. We cannot simply override rights granted in the Constitution by regulation or policy. Soldiers do not forfeit their rights under law upon enlistment. Indeed, because of their service and potential sacrifice, their rights as citizens must and should be carefully protected. My brothers have in this case sanctioned the extension of "inspection procedures" to the point that it mocks the concept of justice under law.

I would set aside the findings of guilty of and dismiss Charge I and its Specification, and reassess the sentence.

APPENDIX

5TH INFANTRY DIVISION (MECH)

FORT POLK, LOUISIANA 71459

20 MAY 87

CAV-A

SUBJECT: Commanders Policy Letter # 10-Alcohol and Drug Abuse

1. It is obvious that the use of controlled substances is illegal and will be punished under the provisions of the Uniform Code of Military Justice. Alcohol abuse will be treated in an equally serious manner when it interferes with the efficient performance of an individual's duties or when an individual's actions reflect discredit upon the unit.

2. Abuse of any drug, and for purposes of this policy statement alcohol will be considered a drug, is detrimental to unit performance, compromises individual integrity and ultimately endangers the health and welfare of the abuser and those who work around him. I have tasked the chain of command to be aggressive in the identification of potential drug and alcohol abusers.

1. There is support for the proposition that soldiers have no or at least should have no Fourth Amendment protection in barracks. *See United States v. Moore*, 23 M.J. 295, 299-300 (C.M.A. 1987) (Cox, J., concurring in the result).

2. The military judge found that there was no probable cause to search but that the second test was merely a continuation of an inspection.

3. The Troop A Alcohol and Drug Abuse Prevention Program is based upon several principles:

A. Drugs are illegal and will not be tolerated.

B. Possession of any drug related apparatus or paraphernalia is strictly prohibited and personnel in violation of this policy are subject to punishment under provisions of Article 15 UCMJ.

C. Each man is assumed to be capable of acting in a mature manner in his consumption of alcoholic beverages. Consequently, alcohol may be in an individual's possession in the billets but must be under lock and key during duty hours. As this is a privilege, it will be revoked anytime an individual demonstrates an inability to deal with this responsibility.

D. Due to the hazardous nature of our profession, absolutely no alcoholic beverage will be consumed during duty hours. Exceptions to this rule for section or troop parties will be requested in writing through the 1SG or the Troop Commander.

E. No alcohol will be transported to the field or consumed during field training exercises.

F. Any individual prescreened positive during monthly random urinalysis testing will be rescreened during the following months urinalysis.

4. The Alcohol and Drug NCO will conduct semi-anual education classes, supervise random urinalysis at the commanders direction, assist individuals who desire to seek voluntary counseling and coordinate mandatory referral of individuals involved in drug or alcohol related incidents to the Alcohol and Drug Control Office.

5. The Troop A chain of command is prepared to assist any individual in the search for either medical assistance or alternatives to drug or alcohol abuse. An individual who voluntarily offers information concerning problems will not be prosecuted provided he has not come forward with the knowledge that he is about to be apprehended. Individual soldiers are encouraged to exert positive peer pressure and "clean" their own ranks of the alcohol or drug abuser. Our profession is too dangerous and too important to tolerate less than 100% effort from each other.

/s/ Mark S. Lake
Mark S. Lake
CPT, Cavalry
Commanding