UNITED STATES

v.

**Senior Airman Kenneth H. MURPHY, FR 437–82–4351, United States Air Force.**

**ACM 27299.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 7 Oct. 1988.

Decided 28 April 1989.

---

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Paul M. Dankovich.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Terry M. Petrie.

Before HODGSON, HOLTE and PRATT, Appellate Military Judges.

### DECISION

PRATT, Judge:

Contrary to his plea, appellant was found guilty of wrongful use of cocaine by a general court-martial composed of members. His sentence consists of a bad conduct discharge, confinement for two months, total forfeitures, and reduction to airman basic.

### I

The charge against appellant stemmed from a urinalysis inspection of his unit which resulted in the discovery of the principal cocaine metabolite in the urine sample provided by appellant. At trial, appellant challenged the admissibility of these results on the grounds that the inspection did not conform to the requirements of M.R.E. 313(b). Specifically, appellant contended that his commander, in directing the inspection, did not do so for any of the "primary purposes" articulated in M.R.E. 313(b). The military judge denied the motion to suppress, and the appellant now raises this issue on appeal.

We hold that the military judge was correct in denying the defense motion to suppress. This issue, one of first impression, merits discussion.

In pertinent part, M.R.E. 313(b) provides:
An "inspection" is an examination of the whole or part of a unit ... conducted as an incident of command the *primary purpose* of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit....
An examination made for the *primary purpose* of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. (Emphasis added).

In support of his motion to suppress at trial, the appellant relied on the candid testimony of his unit commander, Captain Witt. Captain Witt explained that, a few days prior to the testing, he received a call from a Social Actions counselor. The counselor, noting that it had been two years since Captain Witt's unit had participated in the urinalysis program, asked if Captain Witt would like to test his people and thereby "help and support the Air Division's overall goal." Captain Witt readily agreed to inspect his unit, seeing this as "just another opportunity of, you know, doing our part" in support of the Air Division.

The trial defense counsel pointedly elicited testimony from Captain Witt which reflected that, although he was aware of the purpose of the urinalysis program, his thought process did not involve the concerns delineated in M.R.E. 313(b):

Q. At the time you agreed with [the Social Actions counselor], none of these thoughts about readiness or the fitness of the unit went through your mind?

A. Right. Absolutely not.

Q. It was just a square filling exercise?

A. Right.

Q. So your primary purpose on the 3rd of March was not to determine the readiness, fitness for duty of the people in your unit, right?

A. My decision at the time was based on supporting the Air Division, and if that meant going through with the procedure and filling the square for another two years, yes, that's right. That was my motive.

Q. That was your sole motive then? You didn't say, "Gee, I've got to do a health and welfare inspection of my troops to make sure these guys are free of drugs", right?

A. No. No.

As noted above, this situation presents a novel issue. Appellant does not assert that the inspection in issue was a subterfuge search, that it was one in which the "clear and convincing" standard of M.R.E. 313(b) was applicable, *see United States v. Parker*, 27 M.J. 522 (A.F.C.M.R.1988), that the inspection was conducted in an "unreasonable, degrading, improper, or illegal manner," *see United States v. Valenzuela*, 24 M.J. 934 (A.C.M.R.1987), or that the degree of intrusion was unreasonably related in scope to insure readiness, *see United States v. Middleton*, 10 M.J. 123 (C.M.A. 1981). Nor does he raise an issue of constitutionality with regard to inspections *per se*, acknowledging that inspections conducted pursuant to M.R.E. 313(b) have passed constitutional muster. *See New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); *United States v. Flowers*, 26 M.J. 463 (C.M.A.1988); *United States v. Middleton, supra.*

Instead, appellant asserts that this particular inspection was "unconstitutional" because his commander did not possess a "primary purpose" cited in M.R.E. 313(b).

■ In our opinion, a distinction must be made between the underlying "primary purpose" of an examination and what we will call the "immediate motive" of the commander in directing it. In other words, a commander may have any variety of "immediate motives" for directing an examination of his unit without running afoul of the "primary purpose" language of M.R.E. 313(b). For instance, a commander's "immediate motive" may be to support his superior, to comply with a regulatory requirement, to demonstrate for a successor the method of operation, to test unit inspection procedures, to meet a recommended testing quota, or simply to exercise his inherent authority to inspect.[1] These "immediate motives" are not inconsistent with the coexistence of a proper underlying "primary purpose", i.e., to insure security, military fitness, or good order and discipline.

■ On the other hand, when a commander's "immediate motive" is to catch Airman X with contraband, to seize drugs reportedly seen in Airman Y's room, or to generate a few courts-martial for deterrence purposes, such motives are inconsistent with and "infect" the primary purpose of the examination, rendering it a search. Indeed, it is exactly this "infection" which M.R.E. 313(b) seeks to expose and decry. As the Army Court of Military Review has stated, quite correctly we believe, in reference to M.R.E. 313, "the evil to which the evidentiary rule is directed is an examination conducted for the primary purpose of securing evidence for use in disciplinary proceedings." *United States v. Rodriguez*, 23 M.J. 896 (A.C.M.R.1987).

■ When read in this context, we discern that the "primary purpose" language of M.R.E. 313(b) is not intended to limit, or create a standard for testing, the "immediate motives" of commanders in the discretionary exercise of their inherent authority to inspect. Rather, it is definitional language designed to establish a basis for distinguishing a legitimate inspection from one which constitutes a subterfuge search.

---

1. In *United States v. Rodriguez*, 23 M.J. 896 (A.C.M.R.1987), for example, a battalion commander directed inspection testing after receiving a monthly urinalysis quota from the infantry division. Although he did not suspect any- one in the unit of abusing drugs, the commander testified that his purpose was to implement Army policy and to comply with Army regulations requiring annual testing of aviation personnel.

762

■ Accordingly, when a commander directs a random urinalysis inspection of his unit, or of a portion thereof, it is wholly appropriate that the circumstances surrounding his decision to inspect be closely examined in order to insure that the primary purpose of the inspection is not the development of evidence for use in prosecution or other disciplinary proceeding, i.e., a search. Having satisfied that query, however, it is neither appropriate nor necessary to question his "immediate motives" for directing the inspection.

■ Translated into the terms of our analysis, the appellant's concern is that his commander, by his own testimony, specifically disclaimed the underlying "primary purpose" which would have qualified the examination as an inspection under M.R.E. 313(b). We disagree.

Captain Witt, with admirable candor and an understandable lack of legal sophistication, did not recognize that the words "primary purpose" were being used as a term of art. As a result, he allowed the trial defense counsel to elicit answers about his "immediate motive" couched in terms of "primary purpose". By equating the two, the defense counsel was able to elicit answers which appear to establish that the "primary purpose" called for in M.R.E. 313(b) was entirely absent.

Unlike other types of inspections under M.R.E. 313(b), urinalysis inspections are a major component of a Department of Defense drug suppression effort. It has often been asserted, and as often acknowledged, that drug abuse in the military is a most serious problem. *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980) and cases cited therein. In September 1981, the Department of Defense addressed this critical problem by instituting a drug testing program for implementation by each of the military services. DoD Directive 1010.1, *Drug Abuse Testing Program*, 28 December 1984. The goal of this program is to deter drug abuse and thereby help commanders to maintain the morale, welfare and health of their personnel. Air Force Regulation 160-23, *Drug Abuse Testing Program*, paras. la and lf (July 1986); Air

Force Regulation 30-2, *Social Actions Program*, para. 5-2 (Apr 1986). At the very heart of this program is inspection testing which is cited as "[t]he testing method which best achieves this deterrent goal" because it has "the potential to reach each Air Force military member." AFR 30-2, para. 5-5. In the Air Force, testing allocations are apportioned to bases through the Major Air Commands and a variety of functional disciplines share responsibilities for implementing the program. Unit commanders are charged, among other things, with the responsibility of using drug tests to achieve both detection and deterrence. AFR 30-2, para. 5-13f.

This drug testing program, now nearly eight years old, has become a mainstay of the military's efforts to ferret out drug abuse and thereby insure the health and readiness of its members. As a result, random urinalysis inspections have become largely routine in their administration. The encouragement for commanders to use this valuable tool, together with the mechanics of processing large numbers of urine samples, has engendered administrative procedures and responsibilities which add to this sense of "routine". *See generally* AFR 30-2, AFR 160-23. This does not, however, dilute the legitimacy of such inspections or of their underlying purpose. In fact, it is the broad recognition of that purpose which has led to the near institutionalization of these inspections throughout the Air Force.

Under these circumstances, where there is no indication that a search is intended, we hold that a commander who engages in the routine mechanics of the urinalysis program has implicitly adopted the primary purpose underlying that program, regardless of the extent of his ability, or his occasion, to specifically articulate that purpose.

The military judge, in ruling on the defense motion to suppress, stated it quite well:

I find that "to support the Air Division" is not an improper motivation. Although Captain Witt did not express his primary

motive as determining the security, military fitness, or good order and discipline of his unit, supporting the Air Division in the implementation of a drug testing program to accomplish that is not inconsistent or would it accomplish other than those goals for which the program has been established.... To hold otherwise, that a commander must each time express to himself that, yes, I want to conduct urinalysis tests for the specific reasons of military fitness and good order and discipline, would be a play on semantics which I feel would be contrary to the rationale of the military rule governing such inspections.

In this case, it is abundantly clear that Captain Witt was not instigating a subterfuge search, as the testimony cited earlier readily reflects. He was devoid of suspicion toward appellant or any other members of his unit. Trial and appellate defense counsel repeatedly point out that Captain Witt, by his own account, was just "filling a square". However, even accepting their characterization, we find it significant that the "square" he was "filling" was compliance with his responsibility as a commander to participate in the Air Force drug testing program, whose primary purpose is unquestionably consistent with the spirit and intent of M.R.E. 313(b).

To require that commanders specifically regurgitate the primary purpose language of M.R.E. 313(b) is neither necessary nor desirable. It is not necessary because, as stated earlier, the "primary purpose" language of M.R.E. 313(b) simply represents a definition designed to differentiate inspections from searches. It is not desirable because such a requirement would tend to discourage in commanders the degree of candor necessary to enable the courts to make that differentiation. *See Rodriguez, supra*, at 899 n. 5.

## II

In a separate issue, appellant invites our attention to the apparent inconsistency between the approved sentence and the principle of *United States v. Warner*, 25 M.J. 64 (C.M.A.1987). In *Warner*, the Court of

Military Appeals held that a sentence which imposes total forfeitures is inappropriate when *no* confinement is adjudged because such a sentence could result in the servicemember serving in a duty status with no pay whatsoever. In reaching this result, the Court relied on "the well-established policy", currently found in the Discussion of R.C.M. 1107(d)(2), that "when an accused is not serving confinement, the accused should not be deprived of more than two-thirds of his pay for any month." 25 M.J. at 66, 67. *See* R.C.M. 1107(d)(2) and MCM, paragraph 88b (1969).

Unlike *Warner*, the present case involves a sentence which includes total forfeitures and two months confinement. The issue here, then, is whether the underlying principle of *Warner* has application to this case. The Court in *Warner* made passing reference to this issue but did not resolve it:

It is unclear whether the phrase about "an accused who is not serving confinement" ... refers only to someone who has *never* been sentenced to confinement, or instead, also includes an accused who has been sentenced to confinement but has completed that portion of his sentence.

25 M.J. at 66 n. 2.

■ In our view, this entire issue is rendered moot by the operation of the Department of Defense Pay and Allowances Entitlements Manual and Air Force Regulation 111–1. The Department of Defense Pay and Allowances Entitlements Manual, at paragraph 70508d, states:

A member under sentence to dishonorable or bad conduct discharge, total forfeiture, and confinement, released from confinement and restored to duty, is entitled to pay and allowances from the date restored to duty *and the forfeiture becomes inoperative thereafter*. This applies even though no other action may have been taken to suspend, remit, or mitigate the sentence to total forfeitures. (Emphasis added).

Air Force Regulation 111–1, *Military Justice Guide*, para. 16–13 (30 September

1988) provides similar and additional guidance:

 a. A sentence to total forfeiture is not enforceable when a member is in a duty status. Therefore, reversion or restoration to a duty status returns the accused to pay status, *even though no action may have been taken to defer, suspend, or remit the sentence to total forfeitures.*

 b. To make clear the effect of return to duty status upon a sentence to total forfeitures, the total forfeitures should be deferred, suspended or remitted expressly, in whole or in part, by court-martial order, effective the date of release from confinement or return to active duty (MCM, 1984, R.C.M. 1107(f)(4)).

 c. If total forfeitures are mitigated to partial forfeitures for a definite period, the amount of forfeitures will not exceed two-thirds pay per month.

 d. The SJA responsible for issuing the supplementary court-martial order will monitor this matter to ensure that other agencies, for example, CBPO and the finance office, are aware of the accused's reversion to entitlement to pay.

(Emphasis added).

As we read these provisions, they provide an accused automatic protection against finding himself or herself serving in a duty status without pay. In cases of adjudged total forfeitures and a short period of confinement, AFR 111-1, paragraph 16-13b allows an appropriate authority to issue a supplemental order, to be effective on the date of release from confinement, mitigating total forfeitures to partial forfeitures for a definite period of time. Paragraph 16-13c limits the amount of partial forfeitures to a maximum of two-thirds pay per month. Most importantly, if no action is taken under paragraph 16-13b, paragraph 16-13a provides for automatic return to pay status.

■ Applying this regulatory scheme to the case before us, there being no supplementary order issued pursuant to the above-cited paragraph 16-13b, the adjudged total forfeitures became inoperative

upon appellant's release from confinement on 23 November 1988.[2] On 6 December 1988, appellant was placed on required excess leave, at which time any pay entitlement ceased. During the interim period between 23 November and 6 December, while appellant was on ordinary leave, he had reverted to full pay status by operation of paragraph 16-13a.

Appellant's pay status was governed by the operation of the above-cited provisions of the Department of Defense Pay and Allowances Entitlements Manual and AFR 111-1. Intervention by this court is unnecessary.

Accordingly, the approved findings and sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Chief Judge HODGSON and Judge HOLTE concur.

---

**2.** The Government's MOTION TO SUBMIT DOCUMENTS is granted.